(C. D. 1624)

C. J. Tower & Sons *v.* United States

United States Customs Court, Third Division

(Decided June 17, 1954)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.
*Warren E. Burger,* Assistant Attorney General (*Dorothy C. Bennett,* trial attorney), for the defendant.

Before EKWALL and JOHNSON, Judges

JOHNSON, Judge: The merchandise at issue in this case was described upon the invoices as zirconium oxide; zirconium oxide, zirkite grade; fused zirconia concentrates, zirkite grade; zirconia concentrates, zirkite grade; zirconia concentrates, zircon grade; zirconia concentrates, zirconia "C"; and zirconia "C" concentrate. It was assessed for duty under the provisions of paragraph 214 of the Tariff Act of 1930. Under the entries made before January 1, 1948, the merchandise was assessed at 30 per centum ad valorem, and under the entries made after that date, it was assessed at the rate of 15 per centum ad valorem under said paragraph, as amended by the General Agreement on Tariffs and Trade, T. D. 51802. The plaintiff claims that the merchandise is properly entitled to free entry under the provisions of paragraph 1719, as amended.

The provisions of the Tariff Act of 1930, or, as that act was amended by various trade agreements, are as follows:

PAR. 214. Earthy or mineral substances wholly or partly manufactured and articles, wares, and materials (crude or advanced in condition), composed wholly or in chief value of earthy or mineral substances, not specially provided for, whether susceptible of decoration or not, if not decorated in any manner, 30 per centum ad valorem; * * *.

Paragraph 214, amended by the General Agreement on Tariffs and Trade, T. D. 51802:

Earthy or mineral substances wholly or partly manufactured and articles, wares, and materials (crude or advanced in condition), composed wholly or in chief value of earthy or mineral substances, not specially provided for, whether susceptible of decoration or not (except synthetic materials of gem stone quality, such as corundum and spinel, and articles and wares composed wholly or in chief value of such materials, and except marble chip or granite:

| | |
|---|---|
| If not decorated in any manner: | |
| Stone (except Cornwall stone), not specially provided for, ground, or crushed otherwise than merely for the purpose of facilitating shipment to the United States | 10% ad val |
| Diamond dies, pierced or partially pierced, mounted or unmounted | 20% ad val. |
| Other | 15% ad val. |
| If decorated | 20% ad val. |

TITLE II—FREE LIST

PAR. 1719. Minerals, crude, or not advanced in value or condition by refining or grinding, or by other process of manufacture, not specially provided for.

The provisions of the Tariff Act of 1930, as amended by the trade agreement between the United States and Brazil, T. D. 48034, December 3, 1935, are as follows:

| Tariff Act of 1930 paragraph | Description of Articles | Rate of Duty |
|---|---|---|
| 1719 | Zirconium ores or concentrates_____ | Free. |

The provisions of the Tariff Act of 1930, as amended by the General Agreement on Tariffs and Trade, T. D. 51802, December 16, 1947, are as follows:

| Tariff Act of 1930 paragraph | Description of Products | Rate of Duty |
|---|---|---|
| 1719 | Minerals, crude, or not advanced in value or condition by refining or grinding, or by other process of manufacture, not specially provided for: Lignite, Cornwall stone, gravel, natural gas, nepheline syenite, beryllium ore, titanium ore (except ilmenite and ilmenite sand), columbium or niobium ores or concentrates, tantalum ore, and zirconium ores or concentrates. | Free. |

Respecting the paragraph under which the merchandise is claimed free of duty, it will be observed that the entries made before January 1, 1948, are claimed under paragraph 1719 by reason of the addition to the general description of specific provisions for zirconium ores or concentrates. Under the General Agreement on Tariffs and Trade, the general description of paragraph 1719 ˉfor crude minerals, as appearing in the Tariff Act of 1930, also made specific provision for a variety of articles, not otherwise specially provided for, including zirconium ores or concentrates.

At the trial, a stipulation agreed to between counsel for the plaintiff and the defendant was admitted in evidence as collective exhibit 1. It provides as follows:

* * * that the protests listed in the attached schedule may be consolidated for trial.

It is further stipulated and agreed as follows:

1. That with the exception of entries 1454 and 1585 in protest 180707–K, and entry 2067 in protest 171562–K, all of the merchandise imported under the entries

here involved was stabilized zirconium oxide produced in The Norton Company's Canadian plant by a process such as or similar to the process described in U. S. Patent 2,535,526, applied for January 19, 1950, and issued December 26, 1950 to A. H. Ballard and D. W. Marshall, and assigned to The Norton Company, the importer of the instant merchandise. A certified copy of the aforesaid patent is attached hereto as Exhibit "A" and is made a part of this stipulation.

2. That with the exception of the aforementioned entries 1454 and 1585 in protest 180707–K and entry 2067 in protest 171562–K, all of the merchandise imported under the entries here involved contained approximately 3 to 5% of calcium oxide (lime) at the time of importation into the United States.

3. That the presence of the aforesaid amounts of calcium oxide (lime) in the imported merchandise was due to adding calcium oxide (lime) to the raw material in the Canadian plant of The Norton Company in addition to any calcium oxide (lime) which may have been present originally in said raw material.

4. That the schedule attached hereto as Exhibit "B" lists The Norton Company's chemical analyses of the respective raw materials that went into their aforesaid Canadian furnace to produce the instant importations, together with the respective amounts of calcium oxide (lime), or magnesium oxide, added thereto in each instance; also The Norton Company's chemical analyses of the instant importations.

5. That the crystal structure of such of the instant importations as contain approximately 5% of calcium oxide (lime), or 5% of magnesium oxide, is essentially cubic.

6. That the crystal structure of such of the instant importations as contain approximately 3% of calcium oxide (lime), or 3% of magnesium oxide, is approximately 50% monoclinic and 50% cubic.

7. That the crystal structure of such of the instant importations as contain no added calcium oxide (lime), or added magnesium, is essentially monoclinic.

8. That in heating monoclinic crystals of zirconium oxide (baddeleyite) to high temperatures and in cooling the heated crystals to room temperature sharp dimensional changes occur at certain temperatures.

9. That in heating cubic crystals of zirconium oxide to high temperatures and in cooling the heated crystals to room temperature sharp dimensional changes do not occur.

10. That the presence of approximately 50% cubic crystals of zirconium oxide in crystalline zirconium oxide prevents sharp dimensional changes from occurring on heating and cooling as described in paragraph 8 of this stipulation.

11. That "Zirkite" is a trade name for a mineral or ore sold by the Foote Mineral Company, Philadelphia, Pa. It contains zircon (zirconium silicate), altered zircon, zirconium oxide (baddeleyite), free silica, and possibly some silicate compounds of other minerals present such as iron, calcium, etc.

12. That "Zircon Sand" is a common name for a natural physical state of zirconium silicate (zircon). It may contain some zirconium oxide (baddeleyite) as such, in small amount, some free silica, in small amount, and other impurities.

13. That "Favas" is a pebble form of zirconium ore consisting essentially of baddeleyite with small amounts of zircon and silica and other impurities.

14. That the terms "zirconia" and "zirconium oxide" are synonymous and refer to a chemical combination of zirconium metal and oxygen.

15. That "Zirconium silicate" is a definite compound containing no free zirconium oxide as such, and no free silicon dioxide (silica) as such.

16. That the terms "zircon" and "zirconium silicate" are synonymous and refer to a chemical combination of zirconium metal, silicon and oxygen.

17. That the term "silica" means silicon dioxide, a chemical combination of silicon and oxygen.

18. That the term "silicon" means the chemical element silicon.

19. That the term "silicate" refers to a chemical combination of the elements silicon, oxygen, and a metal or metallic radical such as iron or sodium.

20. That it is the practice of chemists to report the analysis of minerals such as those here involved, as oxides of the elements present. Their report does not necessarily mean that any of the elements reported are present in the merchandise as oxides.

21. That by means of other methods of analysis, such as x-ray diffraction or examination by means of the petrographic microscope, the actual state of the combination of the various elements usually reported as oxides can be ascertained.

22. That an ore of an element may occur in nature in the form of one or more chemical compounds.

23. That an ore may occur in various states of purity in nature.

Exhibit B, attached to the foregoing stipulation, shows the results of chemical analyses of the various natural products, before being subjected to the heating process, noting particularly the extraneous ingredients in the ores, including the calcium oxide (lime) added thereto, and the percentages of those chemicals present after the heating process. It is observed that most of the materials to which lime was added still contain substantially the same quantities of lime after the heating process, some containing a trifle more lime than was added, and others slightly less than was added. In one instance, the percentage of added lime was not changed in the product after being subjected to the heat of the furnace. No lime was to be found in three entries of zircon sand. The silicon dioxide, the ferrous trioxide, and titanium dioxide in the resulting product were much less than in the original ores subjected to the furnace heat. A few examples of the analyses follow:

| Entry | Date | Ore | $SiO_2$ | $Fe_2O_3$ | $TiO_2$ | Added CaO | $SiO_2$ | $Fe_2O_3$ | $TiO_2$ | CaO |
|---|---|---|---|---|---|---|---|---|---|---|
| 02059 | 12/19/46 | Favas | 6. 77 | 5. 43 | ____ | 6% | 0. 06 | 0. 07 | 1. 14 | 6. 13 |
| 6834 | 4/4/49 | Zirkite | 22. 09 | 2. 92 | 0. 63 | 5% | 0. 66 | 0. 36 | 0. 86 | 5. 74 |
| 7504 | 5/4/49 | Scrap | ____ | ____ | ____ | 5% | 0. 19 | 0. 45 | 1. 06 | 4. 84 |
| 7999 | 5/25/49 | do | ____ | ____ | ____ | 5% | 0. 29 | 0. 68 | 1. 06 | 5. 28 |
| 8479 | 6/23/49 | Zircon Sand | 32. 62 | 0. 08 | 0. 39 | 5% | 1. 69 | 0. 92 | 0. 40 | 4. 66 |
| 3860 | 12/8/49 | do | 33. 67 | 0. 14 | 0. 26 | 5% | 0. 72 | 0. 82 | 0. 40 | 5. 35 |
| 4083 | 12/15/49 | Zirkite | 22. 09 | 2. 92 | 0. 63 | 5% | 0. 58 | 0. 81 | 0. 83 | 5. 00 |
| 5143 | 2/3/50 | Zircon Sand | 33. 67 | 0. 14 | 0. 26 | 5% | 0. 28 | 0. 40 | 0. 37 | 4. 64 |
| 2067 | 9/13/50 | do | ____ | ____ | ____ | ____ | 0. 94 | 0. 85 | 0. 12 | ____ |
| 1454* | 8/18/51 | do | ____ | ____ | ____ | ____ | 27. 83* | 0. 19 | 0. 08 | ____ |
| 1585 | 8/23/51 | do | ____ | ____ | ____ | ____ | 0. 08 | 0. 92 | 0. 27 | ____ |

*Note: Testimony showed 27.83% $SiO_2$ was obviously erroneous.

The plaintiff called four witnesses to testify concerning the imported material. There were no witnesses testifying for the Government in rebuttal. C. W. Blessing, the office manager of the Norton Co. plant at Niagara Falls, Ontario, testified that the schedule, marked exhibit B, attached to the stipulation, contains a list of the entry numbers covering the cases on trial, together with the dates of shipment, analyses, etc., taken from the files and typed under his jurisdiction, and presents a complete record of the laboratory analyses.

John A. Upper, research engineer at the Niagara Falls, Ontario, plant testified that the Norton Co. at Chippawa is a manufacturer of crude artificial abrasive and refractory ores, and the Norton Co. of Worcester, Mass., is the parent organization of the Canadian company. According to the witness, the work at Chippawa consists of electro-chemical and electrothermic processes, concentrating of ores, and the manufacture of electric-furnace products. The witness stated that he is familiar with the articles, as described on the invoices herein, and that all are essentially the same product. That is, they are the final concentrates and, therefore, would be essentially the same, although they come from different source materials, representing different types of crude ores that are concentrated. The witness further testified that the favas, the zirkites, and zircon sands are all ores of zirconium, which consist of materials acquired somewhere in the earth's surface from which zirconium is concentrated. A sample of zircon sand was admitted in evidence as illustrative exhibit 2. The witness also testified that the object of the process was to obtain by itself the zirconium oxides in the zircon sand, as that was the valuable ingredient from which refractories can be produced.

The process in Canada applied to all the imported merchandise was described by the witness as follows:

The ore as imported into Canada was sampled and analyzed; the various impurities in the ore were determined, so that we could calculate a mixture for the concentrating process.

* * * * * * *

Having obtained the chemical analysis of the ore, we make up our mixtures, calculated to effect the desired separation. These mixtures are then fed into an electric furnace, where the silica present, if any, is reduced to a very low value or boiled off; the iron oxide is similarly reduced to a metallic state where it is combined with iron borings that we include in the mixture to form a by-product ferrosilicon which is heavy and sinks to the bottom of the furnace and also has magnetic properties which enable us to extract the metal, the undesired metallic constituent from the ore, and we add lime to the furnace melt for two reasons. Firstly, to * * * stabilize the concentrate in the cubic form, and secondly, to act as a fluxing agent in the concentrating process. The material after treatment in the electric furnace is allowed to cool. It takes considerable time to cool down to room temperature. The furnace is then discharged; the material is crushed into sizes suitable for handling. We run that material through a magnetic separator to take out any of the by-product ferrosilicon produced. We pack it into freight cars and ship it to Worcester in that condition.

A bottle of zirconia concentrate was marked in evidence as illustrative exhibit 3.

The witness testified, concerning the chemical analyses of the various materials, that the symbol $SiO_2$ refers to silica, an undesirable constituent in most of the ores of zirconium; that the symbol $Fe_2O_3$ refers to iron oxide, another undesirable constituent; that the symbol $TiO_2$ is titanium oxide, another undesirable impurity; that the symbol $CaO$ refers to calcium oxide or lime; and that $ZrO_2$ is zirconia or zirconium oxide, the valuable constituent of the concentrate. The witness also stated that no analyses were made of the raw materials of the three entries of zircon sand, to which no lime was added, because zircon sand is fairly constant and for that reason not always analyzed.

As to the zirconia or zirconium oxide in the imported material, the witness testified that it was exactly the same zirconium oxide found in the ore at the start of the process, particularly as there is no place to get it other than from the ore itself; and that the process in question results in greatly increased percentages of zirconium oxide in the concentrate. However, there is the same amount of zirconium oxide in the end product as in the ore before processing, the percentages being greater because of the removal of quantities of undesirable ingredients.

The witness further testified that the only difference in the zirconium oxide found in the natural ore and that found in the concentrate, to which lime had been added to the ore, was in the crystalline structure. In the natural ore, the crystals are in the monoclinic system, and in such concentrate they are in the cubic system.

When the concentrates in question are received in the Worcester, Mass., plant, they are crushed to a more usable size, then calcined at very high temperatures, treated to remove any residual magnetic materials, screened to various component sizes, and mixed with suitable amounts and types of bonds, according to the requirements of the manufactured article. Thereafter, they are formed under pressure in specially designed molds to produce the desired shapes. After firing at very high temperatures in a kiln, the articles are cooled and submitted to inspection. Three of the finished articles were admitted in evidence as illustrative exhibits 4, 5, and 6.

The witness stated that he also testified in the case of *C. J. Tower & Sons* v. *United States*, 26 Cust. Ct. 48, C. D. 1297, as to the manner in which the zirconia concentrates in that case were produced, and that the concentrates involved in entry 2067, protest 171562–K, and entries 1585 and 1454, protest 180707–K, in the pending case are identical with the concentrates involved in such former case. As to the remaining material, he testified it was produced in exactly the same manner as the concentrates the subject of decision in C. D. 1297, except for the addition of lime. The lime was added in the mixtures,

prepared for the concentrating furnace, which are zirconium ores. Once the analysis of the ore is determined, coke is added percentage-wise to reduce the metallic oxides therein to their metallic state. Iron borings are added percentagewise to soak them up, that is, to be a receptacle or blotter for such unwanted impurities, reduced to a metallic state. The lime added thereto serves a dual purpose. It changes the "crystal habit from monoclinic to cubic" and also acts as a flux to carry out the concentration. The proportions of coke, iron borings, lime, etc., added to the ore, depend upon the amount of impurities present in the individual material to be concentrated, as shown by analysis. However, the witness also stated that the processes to which the various materials are subjected were identical, and the changes in composition of the additives were just normal when dealing with raw materials that have natural variations as they occur in nature, necessitating adjustments in the mixture to compensate for those changes in order to finish with a constant end result, and that such is not a difference in processing.

The witness testified further that, when he used the term "concentrate," he meant the resultant product from the treatment of a crude ore to remove unwanted admixed impurities, so that the valuable material in the ore may be obtained by itself. In his opinion, the imported products, those which have the lime added, as well as those which have not, are concentrates because, from impure minerals. the zirconium-oxide content of those minerals has been increased from perhaps 60 to 75 per centum up to around 95 per centum. In the case of the zircon sand, almost a two-to-one reduction in volume was obtained because of the concentration of the zirconia by itself.

The witness, on cross-examination, testified that, in the analyses shown in schedule B, the zirconia was not noted because it is determined by difference; that is, when the silica, iron, titania, etc., are added up, the difference should be the zirconia. Referring to the zirkite, the witness testified that if the concentrate showed 80 per centum zirconia, the ore would be over 50 per centum in oxide form, and the remaining 30 per centum would be in the form of a silicate. The chemical formula for zirconium oxide was given by the witness as $ZrO_2$ and the chemical formula for zirconium silicate as $ZrO_2.SiO_2$, which the witness stated meant that the two were tied together with a chemical bond. In connection with the separation of the two, the witness testified that a mere heating up broke the bond and that the heating and cooling is more of a physical change than a chemical change. With heating, the two oxides dissociate so that concrete particles of zirconium and silica are formed.

In the favas (raw material), the witness testified that the proportion of zirconium oxide was probably 80 per centum to produce the con-

centrate of 92.6 per centum, as there was about 12 per centum zirconium silicate in the favas.

Referring to the raw material, zircon sand, to which 5 per centum lime was added to produce the zirconium oxide of 92 to 94 per centum, and the zircon sand, to which no lime was added, producing zirconium oxide up to 98 per centum, the analysis of the zircon sand of approximately 66.91 per centum zirconium oxide, according to the witness, was principally in combination as a zirconium silicate, as there was something under 10 per centum of baddeleyite present in the sand.

Concerning the shipments of zirconium oxide, which was produced from certain scrap materials obtained from the Worcester plant, the witness testified that these materials had previously passed through the concentration process and also through the manufacturing process, but had been destroyed or damaged in some manner. Since it was a fairly valuable material, it was sent back to recover the useful zirconium oxide. So, this zirconium oxide was not produced from concentrating an ore, but rather it was a recovery from manufactured scrap material. The witness termed this material also a concentrate because, when returned as a scrap, it was not 100 per centum zirconium, but probably was contaminated down to 50 or 60 per centum zirconia so "we really had a concentration job to do again to take these impurities out of this scrap which was an unusual shipment."

When asked whether or not the zircon sand, to which no lime was added, produced a zirconium oxide which was used in the same manner as the zirconium oxide, to which lime had been added before firing, the witness stated that it was, as it had been found that materials which are 100 per centum cubic do not stand up as well in service as those that are partially monoclinic. If the company had some material in the Worcester plant that was 100 per centum cubic, the material from the three entries in question could be added to it. The witness was asked whether the zircon sand, to which lime was not added, was identical with the merchandise the subject of decision in C. D. 1297 — although there, the raw material was zirkite ore—to which the witness replied that it was the same so far as the concentration process was concerned, although actually the material there was zirkite ore, which was predominately baddeleyite, whereas the more recent material had been concentrated from zircon sand, which has a little more zirconium silicate in it.

In connection with the favas and the zirkite, according to the witness, the zirconium oxide is principally in free form, but in the zircon sands the zirconium oxide is principally in combined form. However, the same process is used in obtaining the concentrate, whether or not the zirconium oxide is in combined or free form in the ore. In each case, it is simply a process of concentration to get

the zirconium oxide by itself free of the undesirable elements with which it is either mixed or combined. In the opinion of the witness, nothing basically can be concentrated without producing a chemical change, as "Concentration is aimed at getting higher purities; higher percentages of a desired constituent or constituents; anything you do to remove undesirable constituents does increase the percentage of the desirable constituent which in turn changes the chemical analysis."

In the opinion of the witness, all of the merchandise here involved, with the exception of the three entries of merchandise to which no lime had been added in the raw material, was stabilized zirconium oxide, as described in the Norton patent, part of collective exhibit 1; and there had been no transforming of the material so far as the zirconium oxide was concerned, it all being a process of concentration to obtain the zirconium concentrates.

Wallace M. Hazel, who testified in the former case, C. D. 1297, here testified that he was chief chemist of the Norton Co., Chippawa, Canada, in charge of making analyses since about 1922, including zirconium ores, and that the analyses of the ores, and the merchandise at issue resulting therefrom, were made under his supervision. Referring to the analyses of the ores and the concentrates, attached to collective exhibit 1, as exhibit B, the witness testified that the various percentages of $SiO_2$, $Fe_2O_3$, $TiO_2$, and $CaO$ in the concentrates represented the impurities still remaining therein and were probably the minimum amounts which would be left in an ordinary concentration process. The witness also stated that in the concentrate there is exactly the same amount of zirconia by weight as in the ore, but, of course, the percentage of zirconia in the concentrate is greater by reason of the fact that the concentration thereof to a great extent eliminated the impurities. That does not mean, however, that the zirconium oxide in the concentrate was in the form of a zirconium oxide in the raw material, as it may have been there in the form of zircon; that is, the combined form of zirconium silicate, $ZrO_2.SiO_2$.

Dr. Gordon Finlay, a research chemist with the Norton Co., Chippawa, Ontario, plant, who also testified in C. D. 1297, testified that he was a petrographer, one interested in the study of rocks and minerals, the chief tools of which are the microscope and X-rays; that most of the minerals are ores of the metals; and that most of the ores are combinations of minerals, which is true of zirconium ore. The witness testified that at the present time his duties are solely in the field of consultation; that formerly he examined or directed the examination of zirconium ores, a work now done by an assistant, whom he trained. The witness stated that the zirconia in the imported product was the same zirconia found in zirkite, and that it has to be the same, for the zirkite was the only material it could come from. As for zircon sand, the witness stated that it was a mixture of materi-

als, the chemical symbol for the major constituent being $ZrO_2.SiO_2$; that the $ZrO_2$ is separated by heating up the material, subsequently removing the silica by reducing it with carbon or coke, or by merely heating it. Such process, according to the witness, is one of removal of silica, iron, and other impurities and, therefore, it amounts to concentration, as there is no chemical change in the zirconium oxide. According to the witness, the addition of lime does not make any change in the chemical composition of the zirconium oxide. The witness defined the process of concentration as "An increase in the percentage of the desired constituent."

On cross-examination, the witness further testified that in zirkite, favas, and zircon sand there is zirconium oxide in combined form, and there is more free zirconium oxide in the finished product than in the raw materials, but the proportions are different in the different materials. Then, the question was asked of the witness:

X Q. So that when you answered the question, whether the zirconium oxide in the finished product was the same as that in the raw material, you meant that— I believe the question put was: Was there any change between the zirconium oxide in the raw material and the zirconium oxide in the finished product and your answer, of course, was no. You were referring to that portion of the zirconium oxide which appeared in the raw material as such, is that correct?—A. No. I was referring to the whole zirconium oxide. All the zirconium oxide, its there to start with and finish with.

X Q. It is not in the same form, is it?—A. No. No.

Counsel for the Government referred to a book by F. H. Norton, entitled "Refractories, New Third Edition," and to a preface therein, wherein the witness was mentioned as one of the collaborators in preparation of the work, and, drawing the attention of the witness to what was stated concerning zirconia, he was asked if he agreed with the following:

The most useful compound of zirconium other than the oxide is zirconium silicate which corresponds to the natural mineral zircon, $ZrSiO_4$. This is a staple mineral and can serve as a useful refractory material.

The witness did not see any reason to question it and, on redirect examination, he testified that zirconium silicate may be expressed chemically either as $ZrO_2.SiO_2$ or $ZrSiO_4$; that most chemists write it the latter way, while the mineralogists prefer the divided formula. However, either formula is a symbol for the same material.

Counsel for the plaintiff moved the incorporation of the record in C. D. 1297, inasmuch as the importations with respect to at least three entries were identical, that is, entries 2067, 1454, and 1585, the subject of protests 171562–K and 180707–K, covering merchandise which did not include added lime.

Counsel for the Government objected to the incorporation, particularly inasmuch as 44 entries concerned different merchandise, that is,

ore which was subjected to the stabilizing process by the addition of lime, for the reason that such was a partly manufactured process, which adapted the product to a particular purpose to make a more valuable manufactured article. Objection to the incorporation of the record, however, was overruled by the court, and the case was incorporated.

Counsel for the plaintiff contends that the object of the furnace operation in Canada was to obtain the zirconium oxide content of the ores by means of a concentrating process; that the product the subject of entry 2067, protest 171562–A, and entries 1454 and 1585, protest 180707–K, is exactly the same as the merchandise the subject of decision in the former *C. J. Tower & Sons* case, *supra*; that the merchandise covered by all of the remaining entries involves exactly the same merchandise, except that lime was added in the furnace to the other added materials, the process otherwise being identical with the process followed in the *Tower* case, *supra*.

The Government has made many and varied contentions, all to the effect that the various materials before the court are manufactured rather than crude. To go fully into detail of Government's contentions would unduly extend this opinion. It is stressed, however, that the separation by heat of the zirconium oxide from the zirconium silicate is a chemical reaction amounting to a manufacture, and that whereas zirconium oxide did not exist before processing, it was created by such chemical action; that the 44 entries of merchandise which contain lime in solid solution with the zirconium oxide, the presence of which caused a change in the crystalline structure from monoclinic to cubic, was such advance in condition as to exclude it from free entry under paragraph 1719; that such inclusion of lime resulted in a specially manufactured, improved refractory material, having a new designation of stabilized zirconium oxide, which was produced under a patented formula designed to accomplish results superior to natural zirconia; that it is a different material from that the subject of decision in C. D. 1297; that the cubic system of crystals does not occur in nature; and that the stabilized zirconium oxide represents a manufacture of zirconium oxide and calcium oxide.

It is further contended by Government that the zirconium oxide produced from scrap material, covered by entries numbered 7504 and 7999, protest 153183–K, cannot be classed as a concentration of an ore; and that the merchandise covered by the three entries numbered 1454, 1585, and 2067, in protests 180707–K and 171562–K, produced from zircon sand when zirconium silicate was changed to zirconium oxide, consists of crude materials advanced in condition by a process of manufacture and, as such, are expressly excluded from classification under paragraph 1719, *supra*.

The Government contends further that the raw material, as imported into Canada, was zirconium ore concentrates and, after processing, which actually was a smelting process entirely different from a concentration of ore process, became a manufactured article, as a mechanical separation of ore from unwanted rock is the only concentrating or ore-dressing process to be classified as an unadvanced crude material.

In the *Tower* case, *supra*, the merchandise imported was fused zirconia concentrates. The evidence established that the commodity there at issue was a zirkite ore, containing as a major constituent, baddeleyite, and also zircon and an altered zircon, with minor amounts of free silica in the form of quartz. The ore contained about 45 per centum zircon and altered zircon, and about 50 per centum baddeleyite. In the process of concentration, the zirconium silicate present in the zirkite became zirconium oxide and, thus, the zirconia had increased with the removal of the silica. In holding that the zirkite as processed was a concentrate, the court cited, among others, the case of *In re McKesson & Robbins*, G. A. 4564, T. D. 21638. The issue in that case was whether merchandise claimed to be crude sulphide of antimony ore was still classifiable under such tariff description when it was the product of fusion. The court pointed out that in the fusion operation the gangue or slag was separated, allowing the sulphide of antimony to be run off in ingots. The sulphide of antimony, even though not having undergone any change in character, was, nevertheless, held by the Board of General Appraisers to be no longer an ore.

Upon appeal (*McKesson & Robbins* v. *United States*, 113 Fed. 996), the lower court was reversed, the court stating:

* * * It seems to be the product of a process by which the gangue or slag is separated from the ore by heat. The importation here is such a product; the rock and slag has been removed and the ore is imported.

Following the decision in that case, the court held that the zirconium concentrates had not been affected in character from their condition in the native state by the processes applied thereto, for the reason that the ore still consisted of zirconium oxide, although in a more concentrated form, and the process through which it had undergone had not advanced the ore in value from the condition as found in the earth. The most that could be said of the material there imported, according to the court, was that it contained a greater percentage of zirconium oxide than the ore in the condition prevailing when taken from the ground.

Zirconia, the chemical name for which is zirconium oxide, according to the evidence, occurs native as baddeleyite and contains not only zirconium oxide but also zirconium in the form of a silicate. It also occurs native as favas, a pebble form, but this form contains zircon,

which is a combination of the oxide and the silica. Zirconium ore is further found in native condition in zircon sand. Here, there is only about 10 per centum of the baddeleyite and a much greater portion of zirconium silicate. From the evidence, it is clear that all of these forms are ores of zirconium, and the treatment thereof by fusing produced a concentrate of such ores.

Zirconium itself is defined in Webster's New International Dictionary, Second Edition 1953, as a metallic element found in combined form only. To smelt commonly refers to the method of obtaining a metal from an ore by a process of fusion. The process to which the merchandise in question was subjected was distinctly not undertaken for the purpose of obtaining the metal zirconium. It is distinctly a process designed to eliminate as much extraneous metallic material as is possible from the natural ore and to leave large percentages of zirconium oxide and extremely small percentages of other metallic extraneous minerals. The evidence establishes that zirconium oxide was present in all the ores. In making *eo nomine* provision for zirconium ores and concentrates a part of paragraph 1719 in the various trade agreements and in the General Agreement on Tariffs and Trade, T. D. 51802, the Tariff Commission reporting on such changes must have known that zirconium oxide was one of the principal constituents of zirconium ores, as well as zirconium silicate, and that any concentration to effect the removal of unwanted oxides would necessarily break the bond between the zirconium oxide and silicon dioxide, releasing the unwanted silica. That the imported material is still in a crude state is evidenced by the analyses of the concentrated material, showing percentages of silicon dioxide, ferrous oxide, and titanium oxide. An examination of a sample representing zirconia concentrate discloses that in its imported condition the merchandise is merely a material, neither resembling an article crystalline in character nor a homogeneous mass, but showing that it is fused material in small pieces.

Inasmuch as the process undergone is one which has greatly increased the percentage of zirconium oxide and decreased the percentage of ingredients not zirconium, the court is of the opinion that it is entirely immaterial whether the native ore was zircon sand, baddeleyite, favas, or zirkite. Therefore, it is the opinion of the court that the merchandise covered by the three entries numbered 1454, 1585, and 2067, in protests 180707–K and 171562–K, produced by the concentration of zircon sand, is on all fours with the incorporated case, C. D. 1297, and, in view of the decision in that case and the authorities cited therein, we hold that such merchandise is properly entitled to free entry under paragraph 1719, as amended, *supra*.

Respecting the 44 entries covering merchandise to which, during concentration processes, there was added in the furnace mix certain

specific portions of calcium oxide or lime, such lime in itself caused no chemical change in the final product but became an added material to the ore. However, it was not eliminated in the heating process, but rather remained in solid solution with the concentrate of zirconium and effected a physical change in the crystalline structure thereof. This change in the crystalline structure from monoclinic to cubic, according to the evidence, enhanced the efficacy of the final product in the manufacture of a refractory. In fact, such material, in the opinion of the court, is something more than a concentrate of zirconium. It has become a new article with added uses. At least, as imported, it is zirconium ore, plus calcium oxide. Such combination is more than a concentrate of zirconium ore. The inclusion of calcium oxide has caused the material to acquire a new designation of "stabilized," added to the other descriptive words designating the material. There is no evidence before the court to establish that there has been an advance in value, but the advance in condition cannot be ignored. We, therefore, hold that the merchandise covered by the 44 entries, the analysis of which shows a lime content, is properly dutiable as an earthy or mineral substance, wholly or partly manufactured, as assessed by the collector.

The merchandise covered by entries numbered 7504 and 7999, protest 153183–K, whether containing lime or not, is not the result of a concentrating process applied to an ore of zirconium. The merchandise consists of zirconium oxide the result of an extraction from a scrap material. Clearly, this material is not entitled to free entry as an ore concentrate. We, therefore, hold that it is properly assessed for duty by the collector as an earthy or mineral substance, wholly or partly manufactured.

For the reasons stated, judgment will be entered in favor of the plaintiff, insofar as it concerns the merchandise covered by entry 2067, protest 171562–K, and entries 1585 and 1454, protest 180707–K. In all other respects, the protests the subject of this decision are overruled.