(Reap. Dec. 10548)

E. TARANGER, INC. *v.* UNITED STATES

Entry Nos. 882080–1/5 ; 895746–1/2.

(Decided June 25, 1963)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.
*John W. Douglas*, Assistant Attorney General (*Morris Braverman*, trial attorney), for the defendant.

LAWRENCE, Judge: Appeals for reappraisements 294787–A and 294789–A were consolidated for the purpose of trial and determination. They relate to importations of certain aluminum alloy tubing, produced by Trafilerie e Laminatoi di Metalli, Milan, Italy, hereinafter referred to as Trafilerie.

By stipulations of the parties, said merchandise is identified as follows:

| Reappraisement No. | Date of exportation | Invoice description | | |
|---|---|---|---|---|
| 294787–A | 3/30/53 | | 3S—Hard, ⅜″ x .035″ | |
| " | " | 63 | ST83, 1″ x .049″ | |
| 294789–A | 4/30/53 | 61 | ST6, ¾″ x .049″ | |

The merchandise will be referred to hereinafter by the symbols 3S, 63S, and 61S, respectively.

The stipulations further provide in substance as follows:

a. That *such* aluminum tubing was not sold or offered for sale for domestic consumption in Italy at the time of exportation.

b. That *such* or *similar* aluminum tubing was not sold or offered for sale in Italy for exportation to the United States at the time of exportation.

c. That *such* or *similar* aluminum tubing was sold and offered for sale at the time of exportation to one exclusive purchaser in the United States, namely E. Taranger, Inc., the plaintiff herein.

d. That there was no export value, as defined in section 402(d) of the Tariff Act of 1930, for said aluminum tubing at the time of exportation.

e. That *such* imported aluminum tubing was freely sold and offered for sale by E. Taranger, Inc., at the time of exportation above indicated to all purchasers in the United States for domestic consumption.

f. That, if the court finds that *similar* aluminum tubing was sold or offered for sale in Italy for domestic consumption, the appraised values correctly represent the statutory foreign value.

g. That the United States value for said items was as follows:

```
3S—$0.5375 per pound, net packed
63S— 0.4104  "     "    "    "
63S— 0.4691  "     "    "    "
```

In view of the stipulated facts above agreed to, the issue resolves itself into the question whether "similar" aluminum tubing was sold for domestic consumption in Italy at the time of exportation. Plaintiff has assumed the burden of establishing the negative of that issue.

In addition to the testimonial record, numerous exhibits, consisting of specifications for aluminum products, samples, affidavits, and other documentary exhibits, were received in evidence and will be referred to wherever deemed necessary in the course of this opinion.

Three witnesses testified on behalf of plaintiff and one for the defendant.

Plaintiff's first witness, Edwin Taranger, testified that he is president of the plaintiff company, which is engaged in the importation and distribution of aluminum mill products, a term that applies to semifabricated aluminum. The witness stated that this does not mean basic ingot metal, but anything produced therefrom, such as sheet, rod, extrusions, tubing, forgings, and wire. He handled many kinds of aluminum alloy tubing made from alloys used for that purpose and had sold such products throughout the United States, in amounts of one million to two million pounds annually.

Taranger went to Italy shortly after World War II and established relations with a manufacturer of the types of aluminum products that would be acceptable in the American market. At that time, the manufacturer was fabricating products on specifications adapted to the Italian market, but which were not acceptable to the American market. However, Taranger was able to work out specifications with the Italian

manufacturer through the development and testing of trial lots, which resulted in the production of aluminum alloy tubing possessing the basic properties desired by the American trade. He was associated at one time with the Reynolds Metals Co., said to be the second largest producer of aluminum in the United States. He acquired an intimate knowledge of the process of manufacture of aluminum products and was instrumental in establishing a branch factory of the Reynolds company in Mexico.

In describing the properties possessed by aluminum which create its demand, Taranger mentioned first that it was light in weight and relatively soft. Its strength is greatly developed by alloying, manipulation, and so forth. It is corrosion proof; very resistant to the elements, which attack such products as copper and steel; has great reflectivity of radiant heat; is a good conductor of heat and electricity; is easily machined; can be welded and joined in all methods; can be used in metallurgy; takes a beautiful finish, either coated or through mechanical or chemical treatments. Furthermore, it is nontoxic, nonmagnetic, and nonsparking. Its versatility is emphasized, as stated by the witness—

* * * in the variety of properties that you develop in alloying of the metal with other metals like steel, and in the heat treatment and cold-working processes.

The witness then explained in detail the various modifications of aluminum with the use of well-known alloying materials, depending upon the characteristics one desires to develop. He stated that the industry has adopted a system of nine groups of the principal alloying ingredients.

In the first group, he classified commercial aluminum, which is 99 per centum or more pure, and described it as softer than most of the alloys used with it. It can not be used by itself when any degree of structural strength is required.

The second group was described as the copper group, which was frequently used in the manufacture of aircraft, without which "there would have been no airplane production."

The third is the manganese group, which the witness stated is practically limited to one product. This group was placed on the market in the range of its mechanical properties, depending upon its ultimate use. In its annealed condition, it is used for sheet products which have been cold formed. When it has been worked to a condition, known as a quarter hard and half hard, it lends itself to a number of uses, because it is readily formed and has considerable strength. The full hard alloy, whose use is limited by its relative lack of ductility and is the cheapest of all the alloys, is priced at the same level as aluminum.

The fourth is the silicon group, which is hardly used at all, although it may be used in wires.

The fifth is the magnesium group which is one of the most important. Magnesium enhances the strength and improves the molecular structure of the aluminum. It gives a smaller grain structure and may be used for finishing operations, which could not be successfully produced with other alloys. It is a desirable alloy for anodizing, an electrolytic treatment which induces artificial oxidation. The fact that aluminum naturally acquires an oxide coating after it has been processed, is one of the reasons why it is protected against obnoxious influences. Moreover, an increased thickness of the oxide film is produced by treating the aluminum product in an electrolytic bath, which gives it a fine finish.

The sixth group is a combination of magnesium and silicon, in which magnesium predominates. It may also contain such other alloys as chromium and copper. The preeminent characteristics of this group are strength, "formability," and resistance to corrosion.

The seventh group contains zinc as the predominant element in the alloy. This is a high-strength alloy, not used to any great extent in commercial applications.

As to the eighth and ninth groups, the witness explained that the eighth group is presently the catchall group for aluminum alloys, not included in the first seven groups, and that the ninth group is held in reserve for future requirements.

The witness testified that all aluminum alloys were subject to modification by altering the amount of the alloying elements or by adding new ones "or you may detract others, as long as the dominating alloying elements remain." It also appears that the properties of the different groups may be altered by heat treatment, or by mechanical treatment, annealing, artificial aging, and homogenizing. The mechanical treatment would take place in the rolling mills, drawing benches, extrusion presses, swaging apparatus, and so forth. The availability of an aluminum product is readily modified by minute percentage changes in the alloying elements which are incorporated. To quote the witness—

* * * The 61S is produced with a chromium content of, if I remember correctly, between 3 and 4-tenths of one percent, or maybe a little bit more—less than half of one percent.

Then we have another alloy in the magnesium silicon group which is called 62S which differs from 61S in only one element and that is chromium, alloying, I believe, from one-tenth to one-half tenth or 15 hundredths of one percent. The effect of that change in chromium content will have a bearing on the structure of the grain in the alloy. You will get the finer structure with the higher chromium content, and that, of course, gives it a better finishing property through polishing, and so forth.

When buying and selling aluminum tubing, the trade indicates the type of tubing desired "By the code that's incorporated in the specification numbers." For instance, the specification 3S would signify

a product which embodies the chemical and physical properties that are set forth in the specification 3S. The same is true with respect to the items 61S and 63S.

At this point, plaintiff introduced collective exhibit 1, which is a photostatic copy of certain tables appearing in the handbook issued by the Reynolds Metals Co. for the guidance of buyers of aluminum. It indicates the qualifications and specifications of the three items (3S, 61S, and 63S) with which we are here concerned. The witness stated that similar tables are published in the handbooks "of every major manufacturer or producer of aluminum."

Table 13 of collective exhibit 1 sets forth the "CHEMICAL COMPOSITION LIMITS" of various commercial alloys, including the three items above specified.

Table 21 refers to the "TYPICAL HEAT-TREATING CYCLES FOR WROUGHT ALUMINUM ALLOYS" in which items 61S and 63S are checked. 3S is not shown in the table, because it is not heat treated.

Table 22 names "TYPICAL ANNEALING CYCLES FOR WROUGHT ALUMINUM ALLOYS" in which items 3S and 61S are checked. 63S is not annealed in the manner indicated.

Table 27 makes reference to "TYPICAL MECHANICAL PROPERTIES OF WROUGHT ALUMINUM ALLOYS." Item 3S is checked five times and represents the various tempers of that alloy. 61S is checked three times and represents the commercial available tempers of that alloy. 63S is checked six times as being commercially available in various tempers.

Referring to the second and third columns in table 27 of said exhibit, dealing with ultimate and yield strength, Taranger explained that this is established through laboratory tests in which a specimen is "put in a drawing operation which is calibrated to the strength that's applied to that sample being shown on an indicator, and at the time when the sample breaks that's the tensile strength which it has developed at that point."

The remaining columns in table 27 refer to various other tests, which it is deemed unnecessary to detail here.

The tables above referred to contain rigid specifications indicating the chemical and physical properties, composition, and structure, which fit the various aluminum alloys for their specific uses. Consequently, aluminum alloy tubing is never bought except on fixed specifications.

Plaintiff's exhibit 2, a photographic chart, was introduced for the purpose of showing the variances in grain structure of different types of alloys. It has reference to items 3S and 61S, but 63S is omitted, because it was not a common alloy at the time the chart was made.

The attention of the witness was then directed to the classification of 61S in a silicon magnesium group, referred to earlier as the sixth

group. Copper and chromium are important features of 61S, which the witness described as a strong, ductile, corrosion-resistant product, which can be easily formed, and has a fine grain structure that readily maintains a polish. A sample of 61S, having a sharp bend made by cold forming over a bending machine with a mandril, was received in evidence as exhibit 3.

The most important use of 61S is in the manufacture of "tubular furniture, garden furniture, outdoor furniture." It is not welded; it is bent into shape and joined with bolts. This particular alloy is desirable, for the reason that it will maintain a polish. Another desirable feature of 61S is its ability to be flattened by a cold-welding process without distortion or breaking.

The witness produced a sample of aluminum tubing, identified as T30, which is the product of the manufacturer in Italy who produced 3S, 63S, and 61S. It was received in evidence as exhibit 4.

Taranger testified that T30 had been offered by the manufacturer as a possible product for sale in the United States. It was found commercially unacceptable, because it could not be fabricated in the same way as 61S or 63S. When it was attempted to cold form T30, it would break "at the beginning of the bend," as indicated on illustrative exhibit 4.

Plaintiff then introduced a sample of aluminum tubing, which was received in evidence as exhibit 5 and identified as RE2, which the witness stated had been developed by the same manufacturer (Trafilerie) and sold in Italy. A small quantity was sent to plaintiff with the expectation that it might suit its purposes in the United States. However, it was rejected as unacceptable, because it did not have the proper finishing qualities; had a higher breakage percentage and did not polish—"It developed what we refer to as orange peel in the bends. And it altogether made a poor looking specimen." Upon learning that neither T30 nor RE2 was acceptable, the material was eventually sold for scrap.

The attention of the witness was then directed to an aluminum alloy identified as "Italumag 10" and sometimes privately known as "3SV," which he described as a domestic Italian alloy and part of the system of magnesium alloys. It had been offered to his firm for use in an experimental way similar to that in the case of T30 and RE2. As stated by the witness—

* * * it developed that some of our customers could use that product and we bought certain quantities of it.

It could not be grouped with 3S, because it has no manganese—

* * * That's something we didn't know at the time when it was offered to us. It was not so great in importance at that time because it was intended

just for one specific purpose and nothing else. And as such, as I say, it was offered to us on the mechanical properties and the tests rather than on its alloy composition.

\* \* \* \* \* \* \*

\* \* \* We have since learned that it has no magnesium alloy.

Consequently, Italumag 10 is fundamentally different from 3S. This is confirmed by an affidavit of Dr. Varlonga, exhibit 8, paragraph 10.

With regard to 63S, Taranger testified that he knew of no aluminum product on the Italian market in 1951–1953 that had properties similar to it.

Cross-examination of Taranger did not weaken the substance and value of his direct examination. Taranger had wide experience in the foreign and domestic trade dealing in semifabricated aluminum products. His testimony was forthright, direct, and positive.

As will be pointed out, *infra*, it would appear that the defendant was relying upon the tubing identified as Italumag 10 and RE2 as being similar to the tubing in controversy for the purposes of appraisement.

Plaintiff's second witness, Sidney M. Estridge, testified in substance as follows. He had been engaged in the business of distributing aluminum semifinished articles of both domestic and imported production. He handled aluminum alloys known in the trade as 3S, 63S, and 61S in most of the forms in which they have been manufactured and had sold them to some extent throughout the United States. There is a standard nomenclature for aluminum articles, and they are never purchased without specifying the width, gauge, or length in the case of tubing, or designating the alloy and temper of the materials. He stated that the nomenclature has changed in recent years so that 3S is now known as 3003 and that numerals which might appear after that number would indicate the temper of the material.

Table 13 in exhibit 1 was recognized by the witness as setting forth the standard chemical analyses for alloys 3S, 61S, and 63S, among others, which were standard specifications for those products. He pointed out that every alloy has a numerical designation to identify its chemical composition, which is recognized by the trade who use it and those who manufacture it, and, as above pointed out, the temper of the material is so indicated that—

\* \* \* when you talk about 3S there isn't another alloy that is exactly 3S. \* \* \* If you order 3S you want 3S, and you don't want 2S or 61S. That's the reason for having an alloy designation.

While, in some instances, the differences are slight—

\* \* \* yet the end result in terms of the usage or the function of the materials is so different that the primary producers regard it as necessary to produce different alloys with even only slightly different varying materials in the chemical composition.

If a customer ordered 3S, 3S would be delivered "we don't deliver something else." He knew of no product on the American market during the period 1951–1954 which was similar according to the standards applicable to 3S. Estridge made the same answers with respect to 61S and 63S, which were designed for a specific purpose. As a matter of fact, the European countries were not producing alloys for the American trade during the period above mentioned "except on specific request."

On cross-examination, Estridge made a very clear statement explaining why substitutions could not be made for tubing, such as 3S, 63S, and 61S, as follows:

\* \* \* Customers who produce aluminum products have been advised either by their own engineering staffs or by engineering staffs that they employed or as a result of advice adduced from the primary producers, such as ALCOA, Reynolds, or Kaiser, as to the alloy that is best suited for their purposes. The smaller concerns do not have their own engineering staffs, the larger concerns do. And when they purchase, when they specify a particular item they specify it because they have received the advice of some engineering staff that that particular alloy will do their job. And when they ask us for that alloy and we take an order for it we deliver it, sir.

Plaintiff's third witness, William H. Tandet, testified that, since 1946, he has had supervision of all purchases and sales of aluminum tubing for the Main Machine Co., which is engaged in the manufacture of outdoor furniture; that aluminum tubing is always purchased according to definite specifications, in order to respond to bending, flattening, and so forth, in the production of furniture. The requirements are so exacting that aluminum tubing produced according to certain specifications can not be substituted for tubing having different specifications.

Tandet was familiar with the characteristics of 61S tubing, having purchased it. He was shown exhibits 5 and 6, being samples of RE2, and, after examining them, stated that they could not be substituted for 61S tubing, noting, particularly, that exhibits 5 and 6 could not take the finish which is important in the production of furniture. The witness also recognized 61S (exhibit 3) as a type of material which his firm had used in the manufacture of furniture and also for "making all the handles for the 'Home Lite' power saws made in this country. We can't use anything but 61ST6," the reason being that great tensile strength is required because of the fact that a power saw has a terrific vibration.

On cross-examination, the witness was shown exhibit 6, which is a sample of RE2 with portions of the tubing flattened, and was asked whether he could use that type of material in the manufacture of lawn furniture, to which he replied that he could not, without knowing its alloy specifications, although it might be used for piping.

Tandet stated that the difference in the quality of aluminum products is due to the "variation of the components with it, the chemical make-up of it, physical make-up of it."

At this point, plaintiff introduced three affidavits, executed before the American consul in Italy, in which the deponent was Dr. Giovanni Varlonga. Said affidavits were received in evidence as exhibits 7, 8, and 9, respectively. Further reference to these affidavits will be made, *infra*.

Taranger, being recalled, testified regarding the differences in the value of aluminum metal sold for home consumption in Italy as compared to that sold for export. He stated that the only metal with which he was intimately familiar was raw aluminum, a product of the electric reduction process, which is marketed throughout the world in ingots or pigs. That, he stated, is the basis of all the aluminum fabricating industry. In the majority of modern industrial countries, the industry is developed to a greater extent than in those countries which do not have a large production but sufficient for their domestic purposes. The latter tend to protect the market with duties, in order to develop their industry without meeting onerous competition. In Italy, a duty permits the maintenance of a value of the raw aluminum which enables that country to compete with the world market.

With respect to the merchandise involved in the present importations, an arrangement was made whereby the manufacturer was allowed to import into Italy a quantity of raw aluminum for the purpose of producing semimanufactured aluminum products, such as sheets, coils, tubing, extrusions, and so forth, upon which no duty was levied when exported to this country. It was those factors which entered into his negotiations for the aluminum alloy tubing in controversy.

The court is satisfied, from a review of the testimony of Taranger, Estridge, and Tandet, that the aluminum alloy tubing, designated as 3S, 63S, and 61S, had no counterpart in the Italian market. The testimony is clear that aluminum is an extremely versatile commodity and, in its commercially pure state, it is, relatively speaking, soft and lacking in ductile strength. Nevertheless, in combination with manganese or magnesium, or chromium or other alloys, it is used to create so-called "semi" or "intermediate" products in a great variety of qualities, depending upon the particular use of definite specifications which engineering genius, through labored experimentation, has been able to produce. This is made evident by reference to the Reynolds charts, exhibit 1, which demonstrate how slight differences in the percentages of alloying materials used, chemical composition, effects of heat treatment, annealing, and mechanical properties are vital factors in reaching the end result.

The three affidavits of Dr. Varlonga (exhibits 7, 8, and 9), above referred to, strongly corroborate the oral testimony of plaintiff's wit-

nesses in important aspects. In each affidavit, Dr. Varlonga described himself as having been manager in charge of production of the four different mills of Trafilerie e Laminatoi di Metalli, in Milan, and in three other cities in Italy, for the past 14 years. Seven years prior to that time, he was engaged in the production of mill products.

He is also the owner and founder of another mill in Milan which fabricates "aluminum semis (tubing, sheets, extrusions, etc.) into furniture (tables, chairs, etc.) and building products (window frames, scaffolding, partitions, doors, etc.)." Dr. Varlonga states that he received a degree of doctor of engineering at the University Politecnico in Milan, Italy; is familiar with the production procedures and techniques in making various types of aluminum and to their reaction to exacting tests; Trafilerie has about 2,000 employees and produces about 3,000 tons of aluminum products annually; he is thoroughly familiar with all of the aluminum products shipped to Taranger since 1950, because such products were made under his personal supervision from formulae and procedures, prepared by him to meet the specifications of E. Taranger, Inc.

According to Dr. Varlonga, there are but a few fabricators of aluminum alloy semis in Italy who make products (differing from the types involved herein) competitive with those made by Trafilerie. The uses to which such products are put in Italy are well known to producers who supply the market. Hence, it is essential for the deponent, from a commercial standpoint, to be fully informed with respect to the demands and requirements of consumers and to observe what other producers of competitive aluminum alloy articles are making and offering for sale, and their prices. Italian manufacturers issue pamphlets containing specifications and details about the products they are capable of fabricating, and it is customary to refer to these specifications when placing orders. He visits the mills of his competitors and is acquainted with their plants and equipment and their output. He also discusses their common problems about manufacturing, production techniques, marketing, and new developments. Further reference to the affidavits of Dr. Varlonga will be made, *infra*.

Defendant's witness, Robert J. Ott, was chief regional sales engineer of the Reynolds Metals Co. In that capacity, he assisted salesmen in settling problems of a technical nature with customers and assisted them in developing new uses of aluminum in the New York region. He explained the three processes of manufacturing aluminum tubing: (1) The extrusion process, (2) the mandril method, (3) a combination of extrusion and drawing.

He was familiar with products known as 2S, 3S, 61S, and 63S; that 2S is basically pure aluminum, from which some tubing is made, being chiefly used in the refrigeration industry; that 3S aluminum tubing was being used for some manufacture of lawn furniture. It

developed, further, that Ott had little, if any, knowledge of the character and uses of the three types of aluminum tubing involved in this proceeding. The witness was not qualified to testify as to the uses of the types of aluminum involved in this proceeding prior to 1955. Hence, his testimony is of little value.

Following the testimony of the witness Ott, defendant introduced exhibits B, C, D, and E.

Exhibit B is a so-called Operations Memorandum, prepared by Thomas D. Bowie, American consul at Milan, Italy. Exhibit C is another Operations Memorandum, prepared by Emmett B. Ford, Jr., American vice consul at Milan. Exhibits D and E are reports by Francis X. Di Lucia, Treasury representative at Milan. The contents of these exhibits are not discussed in defendant's brief, and it may be assumed that if they tended to support the action of the appraiser, such information would have been drawn to the attention of the court.

It seems obvious from defendant's exhibit E (a report of Francis X. Di Lucia, Treasury representative in charge, Milan, Italy) and from its brief, that the defendant is relying upon an alleged similarity of aluminum tubing, identified as "Italumag 10" (also privately known as 3SV) and "RE2," to the instant importation. The testimonial record and particularly the affidavits of Dr. Varlonga clearly demonstrate a lack of factual similarity between Italumag 10 and RE2 with 3S, 63S, and 61S.

In plaintiff's exhibit 7, Dr. Varlonga described with much particularity the properties which the users of 61S demand in 61S tubing, with respect to strength, ductility, hardness, and chemical resistance, stating (exhibit 7, paragraph 10) "I personally know that there is no aluminum alloy tubing sold in Italy that meets all of the foregoing properties in the required degree."

With respect to imported item 3S, Dr. Varlonga, in exhibit 8, paragraph 7, stated "To my personal knowledge, I know for a fact that this 3S alloy has never been sold or offered for sale in the Italian market."

After setting forth the physical requirements of 3S as to strength, ductility, hardness, and chemical resistance, Dr. Varlonga states, in exhibit 8, paragraph 9, "I personally know that there is no aluminum alloy tubing sold or offered for sale in Italy that meets all of the foregoing properties in the required degree."

In exhibit 9, Dr. Varlonga gave a detailed description of the special chemical composition of 63S which was produced by his company to meet the particular requirements and specifications of the importer. He stated that, while he had considered the possibility of offering 63S tubing to the domestic Italian market, no sale or offer for sale

for such merchandise to Italian buyers was made by Trafilerie during 1952–1953.

Dr. Varlonga disclosed an unusual depth of knowledge gained from research, engineering, manufacturing, and marketing of aluminum in its various grades and qualities and was entirely familiar with its characteristics, composition, chemical, and physical properties. Through his wide experience and manifold activities, he was acquainted with all phases of the Italian trade making and using aluminum alloy mill products produced by competitors of Trafilerie.

The three affidavits of Dr. Varlonga are so comprehensive and so replete with detailed information with respect not only to items 3S, 63S, and 61S, involved herein, but also with regard to RE2, T30, and Italumag 10, that it would be difficult to do justice to the force and effect of his depositions, if an attempt were made to properly summarize or extract them. Much of value would be lost in such an effort. It is essential to read the affidavits in their entirety to fully appreciate their probative value. It would unduly prolong this opinion to analyze them in detail here.

Some 35 years ago, our appellate court, in *United States* v. *Irving Massin & Bros.*, 16 Ct. Cust. Appls. 19, T.D. 42714, in considering the meaning of the word "similar" in section 402(b) of the Tariff Act of 1922, stated—

> In view of the common meaning of the word "similar" and of the authorities cited, we are of opinion, and so hold, that if goods are made of approximately the same materials, are commercially interchangeable, are adapted to substantially the same uses, and are so used, ordinarily, they are similar, within the meaning of section 402(b). * * *

With slight modifications, unimportant here, the above test for similarity has been consistently applied.

While the court has held that commercial interchangeability is not a *sine qua non* to proof of similarity, *United States* v. *Thomas & Co. (Dehler-Signoret Corp.)*, 21 CCPA 254, T.D. 46788, nevertheless, it is an important consideration in combination with other elements. In *United States* v. *Henry Maier*, 21 CCPA 41, T.D. 46378, the court observed—

> It is apparent, therefore, that for different manufactures of velvets in the gray to be "such or similar" within the meaning of paragraph 2 of said section 402(e), it is not enough that they be of the same general character, but they must be made of approximately the same materials, commercially interchangeable, and adapted to the same uses and so used, * * *

and, in *United States* v. *Wecker & Co.*, 16 Ct. Cust. Appls. 220, T.D. 42837, the court stated—

> * * * The question of similarity is, in each case, to be measured by much the same homely rule that applies to the prospective customer who enters a store seeking some utilitarian article of a certain specified name and style; he finds the article requested is not in stock but that another article, of approximately

the same price and which will perform the same functions, is capable of the same use and may be substituted therefor, is available. Such an article is a similar article, notwithstanding the price, the methods of construction, and the component materials may be somewhat different; but, for all utilitarian purposes, one is a substitute for the other. It is in this sense, we believe, that the word similar was used in said section 402(b).

The authorities above discussed, as well as others of like tenor, are cited and considered by plaintiff in its brief. In none of the cases, however, does it appear that the merchandise there under consideration was of such a complex or intricate nature or contained special chemical, physical, or mechanical features which characterize the subject merchandise. The refinements in the use of different alloys with varying characteristics and composition have resulted in the production of a large variety of aluminum products, each fitted for a special end use and all different one from another. As pointed out by Dr. Varlonga, in exhibit 8, the properties of an aluminum alloy may be modified in various ways: (1) Chemically: By changing the amounts of the respective elements in very small percentages, or (2) mechanically: By including artificial aging or homogenizing, rolling, and stretching, and (3) by the skillful operation of manufacturing equipment and techniques.

As pointed out earlier in this opinion, collective exhibit 1 contains certain tables from a handbook, issued by the Reynolds Metals Company, which sets forth in minute detail "CHEMICAL COMPOSITION LIMITS," "TYPICAL HEAT-TREATING CYCLES FOR WROUGHT ALUMINUM ALLOYS," "TYPICAL ANNEALING CYCLES FOR WROUGHT ALUMINUM ALLOYS," and "TYPICAL MECHANICAL PROPERTIES OF WROUGHT ALUMINUM ALLOYS," for the guidance of manufacturers, dealers, and consumers of aluminum articles, which are definitely recognized as specification products.

In the light of the foregoing judicial authorities, it is the considered opinion of the court that the weight of competent evidence contained in the oral testimony taken before the court, combined with the depositions of Dr. Varlonga, clearly preponderates to overcome the correctness of value found by the appraiser and sustains the claim of plaintiff that similar merchandise to that involved herein was not sold or offered for sale in Italy at or about the time of exportation of the instant merchandise.

Upon the record, the court finds as facts:

1. That the merchandise consists of aluminum alloy tubing, produced by Trafilerie e Laminatoi di Metalli, Milan, Italy, in accordance with specifications supplied by the plaintiff, and was used in this country in the manufacture of patio and lawn furniture.

2. That said merchandise was exported to the United States in the period from March 30 to April 30, 1953.

3. That said merchandise is identified by the symbols 3S, 63S, and 61S.

4. That said merchandise was produced in Italy from commercially pure aluminum, which was imported into Italy from Canada.

5. That neither such nor similar merchandise was sold or offered for sale for shipment to the United States during the exportation period above mentioned.

6. That neither such nor similar merchandise was sold or offered for sale in Italy for home consumption at said dates of exportation.

7. That the United States value of said merchandise was as follows:

| | | | | | |
|---|---|---|---|---|---|
| 3S | $0.5375 | per pound, net, packed | | | |
| 63S | 0.4104 | " | " | " | " |
| 61S | 0.4691 | " | " | " | " |

The court concludes as matters of law:

1. That such or similar merchandise was neither sold nor offered for sale for exportation to the United States during the period from March 30 to April 30, 1953.

2. That such or similar merchandise was neither sold nor offered for sale for home consumption in Italy during said period of exportation.

3. That United States value, pursuant to section 402(e) of said tariff act, is the proper basis of value for the instant merchandise.

4. That the United States value, as that value is defined in section 402(e) of the Tariff Act of 1930, as amended, is that set forth in finding of fact No. 7.

Judgment will issue accordingly.