(C. D. 4695)

WACKER CHEMICAL CORPORATION *v.* UNITED STATES

Court No. 75–7–01741

(Decided May 9, 1977)

*Murray Sklaroff, Esq.,* for the plaintiff.
*Barbara Allen Babcock,* Assistant Attorney General (*John N. Politis* and *Mark K. Neville, Jr.,* trial attorneys), for the defendant.

NEWMAN, Judge: This action concerns the proper tariff classification for certain hyperpure monocrystalline silicon rods or ingots imported by plaintiff from West Germany in 1974 and entered at the port of New York.[1]

---

[1] The case was limited by plaintiff to specific articles designated on the invoices with the entries, as follows (R. 10–12):

| Protest | Entry Number | Article Designation |
|---|---|---|
| 1001–5–003487 | K344853 | AB 37856 |
| | K111327 | AB 37958, AB 37959 |
| | K101666 | AB 37856, AB 37908, AB 37978 |
| | K106121 | AB 37913, AB 37908, AB 20009 |
| | K355669 | AB 37910, AB 37229 |
| 1001–5–003489 | K353216 | AB 37911, AB 37164, AB 37907, AB 37912 |
| | K340100 | AB 20011, AB 37942, AB 37996 |
| | K359453 | AB 37696 |
| | K358340 | AB 37569, AB 37605 |

Entry K344851 in protest 1001–5–003489 was abandoned (R.11).

The merchandise was assessed with duty at the rate of 9 per centum ad valorem pursuant to the provision in item 658.00, TSUS, as modified by T.D. 68–9, for articles of base metals not provided for elsewhere in subpart G of part 3, schedule 6. Plaintiff claims that the importations are properly dutiable at the rate of 5 per centum ad valorem under the provision in item 632.43, TSUS, as modified by T.D. 68–9, for unwrought silicon, containing by weight over 99.7 percent of silicon.

For the reasons stated herein, I have concluded that plaintiff's claim should be sustained.

STATUTES INVOLVED

Classified under:

Schedule 6, Part 3, Subpart G:

Subpart G. – Metal Products Not Specially Provided For

Subpart G headnote:

1. This subpart covers only articles of metal which are not more specifically provided for elsewhere in the tariff schedules.

\* \* \* \* \* \* \*

| | | |
|---|---|---|
| 658.00 | Articles of base metals not provided for in the foregoing provisions of this subpart, not coated or plated with precious metal_____ | 9% ad val. |

Claimed under:

Schedule 6, Part 2, Subpart K:

Part 2 headnotes:

1. This part covers precious metals and base metals (including such metals when they are chemically pure), their alloys, and their so-called basic shapes and forms, and, in addition, covers metal waste and scrap. \* \* \*

\* \* \* \* \* \* \*

3. For the purposes of this part, unless the context requires otherwise—
(a) the term "unwrought" refers to metal, whether or not refined, in the form of ingots, blocks, lumps, billets, cakes, slabs, pigs, cathodes, anodes, briquettes, cubes, sticks, grains, sponge, pellets, shot, and similar primary forms, \* \* \*

\* \* \* \* \* \* \*

Subpart K. – Other Base Metals

Other base metals, unwrought, and waste
and scrap of such metals:
    Other than alloys; and waste and
scrap:

\*   \*   \*   \*   \*   \*   \*

       Silicon:

\*   \*   \*   \*   \*   \*   \*

| | | |
|---|---|---|
| 632.43 | Containing by weight over 99.7 percent of silicon___ | 5% ad val. |

## THE RECORD

At the trial, each party presented the testimony of one witness. Plaintiff's witness was Vern Meissner, its Vice-President of Sales and Marketing; defendant's witness was John William Burd, the Manager of Materials Technology and Development at Monsanto Company. Additionally, plaintiff introduced in evidence eleven exhibits and the official papers; defendant introduced two exhibits.

The facts are:

The importations comprise hyperpure monocrystalline silicon rods or ingots containing by weight over 99.7 percent of silicon. Hyperpure monocrystalline silicon is a semiconductor material, and the rods are used by plaintiff's customers in making semiconductor devices for various electronic applications such as computers, watches, clocks, radios, calculators and space satellites.

The method of producing the imports is not in dispute, and may be briefly described as follows:

Metallurgical grade silicon in granular form (approximately 96 percent pure silicon) is reacted with hydrochloric acid resulting in a hyperpure form of silicon, trichlorosilane (a gas). After further purification, trichlorosilane is decomposed in a hydrogen atmosphere and deposited onto electrically heated filaments of hyperpure polycrystalline silicon known as "slim rods". This "slim rod" process produces hyperpure polycrystalline silicon rods.

The polycrystalline silicon rods, however, are unusable as semiconductor material because their crystal structure is randomly oriented and lacks the desired electrical characteristics. Consequently, the polycrystalline rods are further processed into monocrystalline rods, which possess a suitable crystal structure and electrical properties for use as a semiconductor material.

There are two methods used for converting a polycrystalline silicon rod into a monocrystalline silicon rod: the float zone method and the Czochralski method.

In the float zone process, a rod of polycrystalline silicon is suspended in a chamber, and a molten zone is induced in the silicon using radio

frequency induction heating. A seeding operation is accomplished by first melting the lower portion of the polycrystalline rod by use of a radio frequency induction coil, and gradually bringing the molten zone in contact with a single crystal seed. The molten zone is then slowly moved away from the seed crystal, and the growing crystal assumes the orientation of the seed crystal so that the polycrystalline rod assumes the crystal habitat of the seed.

In the Czochralski method, polycrystalline silicon is deposited in a quartz crucible and melted down by induction or resistance heating. A small single crystal seed is then dipped into the melt and withdrawn under controlled conditions. The molten silicon adheres to the seed crystal, aligning itself with the molecular structure of the seed crystal to form a single crystal silicon rod.

To be useful as a semiconductor material, silicon must neither be too pure nor contain excessive amounts of impurities. Thus, in both the float zone and Czochralski methods, carefully measured amounts of impurities referred to as "dopants" (phosphorous or other materials) are added to the silicon for the purpose of imparting the desired "resistivity property" (R. 82) or "the electrical characteristics * * * that are desired by the ultimate customer or user of the single crystal silicon" (R. 121). This "doping" process, while causing monocrystalline silicon to be less pure than polycrystalline silicon, does not cause the former to be less pure than 99.7 percent of silicon by weight.

Since plaintiff "grows" 95 percent of its monocrystalline rods larger in diameter than is specified by its customers, the rods must be "centerless ground" by passing them along a grinding wheel while at the same time rotating the silicon rods.[2] Plaintiff grinds the rods to within plus or minus 25 microns of the specified diameters, inasmuch as plaintiff's customers "need those tolerances to fit these particular rods or the slices into machinery that is existing at that time in * [their] plant[s]" (R. 92–93).

In addition to centerless grinding, plaintiff determines the crystal orientation of the monocrystalline rods by laser beam or X-ray; and as a means of coding or identifying such crystal orientation, a portion of the circumference of each rod is "flatted". Flatting identifies the crystal orientation of a particular monocrystalline ingot and "is a method of coding the wafers, in addition to providing a cleavage reference plane" (R. 127).

After centerless grinding and flatting, the monocrystalline ingots are etched to remove any damage caused by grinding.

The monocrystalline silicon rods are used by plaintiff's customers as a material for manufacturing semiconductor devices. The rods are

---

[2] Article AB 20011 in entry K340100 was not centerless ground (R. 34–35).

cut into thin slices or wafers, and depending upon the particular devices to be made of the material, the slices may be polished and further processed by adding impurities into the slices by diffusion, by oxidizing the slices, and by alloying them. Also, the slices may be processed by the epitaxial deposition of silicon onto a silicon wafer. The slices are probe-tested for resistivity and scribed to separate the individual chips on the wafer. Additionally, leads may be put on the devices, and they may be encapsulated in some form.

### Opinion

There appears to be no dispute that: 1) the imported monocrystalline silicon rods or ingots contain by weight over 99.7 percent of silicon; 2) the imports were produced from hyperpure polycrystalline silicon rods, and such rods, because of their randomly oriented crystal structure and electrical characteristics, are unusable as a semiconductor material; and 3) the imports were centerless ground and flatted. The principal dispute is one of law, involving the applicability of headnote 3(a) of part 2, schedule 6 (hereinafter headnote 3(a)) to the monocrystalline ingots.

Plaintiff contends that the merchandise is "unwrought" as defined in headnote 3(a) since "it is no more than a primary form, to wit, a source of supply of the metal silicon". Defendant, on the other hand, argues that headnote 3(a) is inapplicable inasmuch as "[i]n the manufacture of the imported merchandise, polycrystalline silicon rod, a primary form of hyperpure silicon, has been converted into monocrystalline silicon rod, which is not a primary form of hyperpure silicon". The Government further urges that "[t]he precise centerless grinding, flatting, and subsidiary operations performed on the imported merchandise are of such character as to advance the monocrystalline rod, precluding item 632.43, TSUS, treatment".

At the outset, we shall consider whether the monocrystalline structure of the rods precludes their classification as "unwrought" as that term is defined in headnote 3(a).

Headnote 3(a) enumerates various primary metallic forms which are useful only as a source of a particular metal. The record shows that hyperpure monocrystalline silicon first appears in the rod or ingot form and that the imports are used by manufacturers of semiconductor devices only as a source of the desired metal. Although the crystalline structure and electrical properties of hyperpure silicon affect its usefulness as a semiconductor material,[3] the crystalline structure of the silicon does not affect its primary form as a rod or ingot. Hence, in my opinion, a monocrystalline silicon rod is as much

---

[3] As noted *supra*, polycrystalline silicon is not usable as a material for making semiconductors because of its randomly oriented cyrstalline structure.

a primary form of hyperpure silicon as is a polycrystalline silicon rod, which defendant concedes falls within the purview of headnote 3(a).[4]

We now turn to defendant's argument that "in addition to the significant advancement marked by the growth of the monocrystalline rod, centerless grinding and flatting are also significant advancements that take the newly-created rod out of primary form status".

Contrary to defendant's contention, the record establishes that the centerless grinding and flatting operations, while performed with precision, do not significantly advance the monocrystalline rods toward their ultimate use in the production of semiconductor devices. The centerless grinding operation serves merely to fulfill the diameter specifications of plaintiff's customers so that the rods or slices cut from the rods will fit the semiconductor manufacturer's processing equipment (R. 92–93, 124),[5] while flatting serves only to identify the crystal orientation of the particular ingot for scribing and other purposes. According to defendant's witness Burd, flatting "is a method of coding the wafers, in addition to providing a cleavage reference plane" (R. 127). When Burd was questioned on cross-examination as to whether the flat would manifest itself on the final product, he reluctantly admitted that out of 400 to 500 circuits on a wafer, a mere 10 to 12 circuits might retain a portion of the flat (R. 145).

The short of the matter is that I am not persuaded that either the centerless grinding to specifications or the flatting operation precludes an "unwrought" status for the merchandise within the purview of headnote 3(a).

Finally, plaintiff has called this Court's attention to the recent decision of our Appellate Court in *United States* v. *Texas Instruments, Incorporated*, 64 CCPA 24, CAD 1178, 545 F. 2d 739 (1976). There, the Appellate Court describes what appears to be the Czochralski method of producing monocrystalline silicon ingots, and the subsequent processing of the ingots into slices and then into transistors.

The issue in *Texas Instruments* concerned item 807.00, TSUS, which provision covers articles assembled abroad of components fabricated in the United States. The Court of Customs and Patent Appeals held that scoring and breaking a silicon slice along provided so-called "streets" to separate individual transistor areas commonly

---

[4] It appears from plaintiff's exhibit 6, a letter from the Bureau of Customs (renamed United States Customs Service) to Mr. Meissner, dated August 28, 1968, that administratively the Bureau made no distinction between silicon ingots solely on the basis of their crystalline structure, contrary to the position urged by defendant in the instant case. The Bureau's letter states:

> Crystal ingots unadvanced or merely cut to facilitate transportation or to fulfill purchaser specifications are classifiable as unwrought metal. * * *
> Crystal ingots which are further advanced are classifiable under item 658.00, with duty at the rate of 16 percent ad valorem. Included in this classification are crystals which have been subjected to X-ray diffraction to determine crystal orientation.

See also plaintiff's exhibit 7 (Reply to Inquiry, VAL: 4.133B).

[5] The Bureau's letter to Mr. Meissner (exhibit 6) states: "Crystal ingots unadvanced or merely cut to facilitate transportation or *to fulfill purchaser specifications* are classifiable as unwrought metal". [Emphasis added.]

created on the slice did not constitute "further fabrication" of the transistor areas within the meaning of item 807.00(a), and consequently the imported transistors qualified for item 807.00(a) treatment.

The Government's argument in *Texas Instruments* respecting item 807.00, which the Appellate Court rejected, is somewhat analogous to its position here respecting headnote 3(a). Relative to item 807.00, defendant argued that the scoring operation performed abroad was a precise, complex machining process conducted at extremely close tolerance, which was a step in the further fabrication of the silicon transistor chips resulting in their enhancement in value or improvement in condition, thereby precluding item 807.00 treatment. As noted *supra*, in the instant case defendant urges that centerless grinding and flatting are precise and complex machining operations, which significantly advance the ingots beyond a primary form of metal within the purview of headnote 3(a).

Upon a careful analysis of the evidence and the arguments of counsel, I conclude that the monocrystalline silicon ingots are properly dutiable as unwrought silicon under item 632.43, TSUS.

Plaintiff's claim is sustained and judgment will be entered accordingly.