Slip Op. 14 -22

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| BEST KEY TEXTILES CO. LTD., | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Before: R. Kenton Musgrave, Senior Judge |
| | : Court No. 13-00367 |
| UNITED STATES, | : |
| | : |
| Defendant. | : |
| | : |

**OPINION**

[Granting motion for reconsideration and dismissing complaint.]

Decided: February 25, 2014

*John M. Peterson*, *Maria E. Celis*, *Richard F. O'Neill*, *George W. Thompson*, and *Russell A. Semmel*, Neville Peterson LLP of New York, NY, for the plaintiff.

*Marcella Powell* and *Beverly A. Farrell*, Trial Attorneys, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, for the defendant. With them on the brief were *Stuart F. Delery*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Amy M. Rubin*, Acting Assistant Director, International Trade Field Office. Of counsel on the briefs were *Claudia Burke* and *Tara K. Hogan*, U.S. Department of Justice, and *Paula S. Smith*, Attorney, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection.

Musgrave, Senior Judge: Considering the plaintiff's motion for reconsideration of that part of the prior opinion on this matter (familiarity with which is here presumed) that addresses jurisdiction under 28 U.S.C. §1581(i)(4), *see* Slip Op. 13-148 (Dec. 13, 2013), as well as the plaintiff's alternative motion for transfer to the U.S. District Court for the District of Columbia pursuant to 28 U.S.C. §1631, the court concludes that quality of the briefing obviates the plaintiff's

motion for oral argument thereon. Opposition from the defendant U.S. Customs and Border Protection ("Customs" or "CBP") contends that the prior decision is correct on the plaintiff's lack of prudential standing to raise the claims it attempts to advance here. The court agrees it is "highly questionable" whether a Customs' ruling that lowers the rate of duty on a product the plaintiff has no expressed intention of importing can result in aggrievement or adverse effect to the plaintiff,[1] either directly or under a "zone of interests" analysis, as intended under the Administrative Procedure Act ("APA"). *See* 5 U.S.C. §702; *Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 395 (1987) ("it was [never] thought . . . that Congress, in enacting § 702, had . . . intended to allow suit by every person suffering injury in fact"). While the court stands by its prior ruling in general, it is, nonetheless, the plaintiff's product that is the subject of the ruling at issue, and the court has undoubted exclusive jurisdiction over the general administration and enforcement of this type of matter in 28 U.S.C. §1581(i)(4). The court will therefore presume Customs' ruling "reviewable," *see Clarke*, 479 U.S. at 399, and the complaint's allegation of "aggrievement" sufficient to invoke jurisdiction under section 1581(i)(4). *See* 5 U.S.C. §702; 28 U.S.C. §2640(e); *see also id*. The prior judgment and that portion of the opinion addressing jurisdiction under section 1581(i)(4) are therefore vacated and hereby replaced, and the motions for transfer and oral argument are denied as moot. This opinion addresses the merits of the plaintiff's complaint.

I. *Background; Standard of Review*

By way of brief background, Customs conducted a revocation ruling proceeding in accordance with 19 U.S.C. § 1625(c). The proceeding resulted in issuance of Headquarters Ruling

---

[1] The court remains unaware of any other suit brought against the government on the claim that the plaintiff or its property should be assessed a higher rate of tax or duty.

Letter HQ H202560, dated September 17, 2013 ("Revocation Ruling" or "RR"), which revoked New York Ruling Letter ("NY") N187601 (Oct. 25, 2011) ("Yarn Ruling"). The Yarn Ruling had classified the plaintiff's proprietary "BKMY" yarn under heading 5605, Harmonized Tariff Schedule of the United States ("HTSUS"), as "metalized" yarn dutiable at 13.2% *ad valorum*. The Revocation Ruling's replacement of the Yarn Ruling holds that BKMY is not a metalized yarn of heading 5605 but a polyester yarn dutiable at 8% *ad valorum*.

The issue before Customs, during the formal notice-and-comment revocation proceeding and the less formal Yarn Ruling request, was the proper statutory classification of the imported yarn for customs duty purposes. This inquiry required (1) ascertaining the proper meaning of specific terms in relevant tariff provisions, which is a question of law; and (2) determining whether the article comes within the description of such terms as properly construed, which is a question of fact. *See*, *e.g.*, *Park B. Smith, Ltd. v. United States*, 347 F.3d 922 (Fed. Cir. 2003). These questions implicate the proper standard of judicial review on the matter as it now stands.

On an ordinary *sui generis* classification question, by trial before the court, Customs is entitled to a presumption of correctness on its findings of fact, and review of its interpretation of relevant statutes is *de novo.* 28 U.S.C. § 2639(a)(1); *see*, *e.g.*, *Jarvis Clark Co. v. United States*, 733 F.2d 873 (1984). The plaintiff argues that even though this case involves a pre-importation ruling, it is the court's obligation to find the "correct decision" to its product's classification pursuant to *Jarvis Clark*,[2] which it avers "does not involve or change the standard of review, but is merely a

_____

[2] *Jarvis Clark* involved an appeal on a protest of a classification, pursuant to which the importer had traditionally borne a so-called dual burden that "apparently arose out of the formalities of pleading: an importer could prevail in a protest only if it pleaded the proper alternative

(continued...)

matter of procedure and remedy." Pl's Reply at 11. The court always endeavors to reach the "correct decision" -- even apart from *Jarvis Clark* -- but be that as it may, this is not an "ordinary" classification case. It is, of course, a review of an administrative record involving the administrative interpretation of the tariff statutes and the facts as they have been mustered before the agency. Such a proceeding is clearly governed by the scope and standard of judicial review of the Administrative Procedure Act ("APA") applicable to the court's residual jurisdiction rather than the evidentiary burdens of proof allocated in 28 U.S.C. §2639. *See* 5 U.S.C. § 706; 28 U.S.C. § 2640(e); *Shakeproof Indus. Prods. Div. of Ill. Tool Works v. United States*, 104 F.3d 1309, 1313 (Fed. Cir. 1997).

Section 706 of the APA provides in relevant part that "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, . . ." and "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706.[3] An agency rule would "normally" be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs

---

[2] (...continued)
classification, and the importer carried the burden of proving the facts pleaded." 733 F.2d at 876. The resolution involved the interpretation of 28 U.S.C. §2643(b), which provides that if the court "is unable to determine the correct decision on the basis of the evidence presented in any civil action, the court may order a retrial or rehearing for all purposes, or may order such further administrative or adjudicative procedures as the court considers necessary to enable it to reach the correct decision."

[3] Thus, to the extent *Jarvis Clark* has any applicability here, "the basis of the evidence presented in [this] civil action", 28 U.S.C. §2643(b), can only be construed as being on the basis of the administrative record, and the "correct decision" is whether Customs' ruling thereon is arbitrary, capricious, an abuse of discretion, or not in accordance with law.

counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut.*, 463 U.S. 29, 43 (1983). In such a review, factual assertions in pleadings and briefs that are not a part of the administrative record must be ignored by the court. *See*, *e.g.*, *Jinan Yipin Corp., Ltd. v. United States*, 35 CIT ___, 800 F. Supp. 2d 1226, 1264 n.48 (2011).

The "arbitrary and capricious" standard of review is "highly deferential," as the parties agree. Def's Resp. at 17, Pl's Reply at 9. *See*, *e.g.*, *Boltex Mfg. Co. v. United States*, 24 CIT 972, 978, 140 F. Supp. 2d 1339, 1346 (2000) ("[i]t is well-settled that the arbitrary and capricious standard of review is not merely deferential to agency action, but the *most* deferential of the APA standards of review") (italics in original), referencing *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000). Pursuant to this standard, the court must (1) consider whether the agency's decision was based on a consideration of relevant factors and whether there has been a clear error of judgment, and (2) analyze whether a rational connection exists between the agency's fact findings and its ultimate action. *See Consolidated Fibers, Inc., v. United States*, 32 CIT 24, 33-36, 535 F. Supp. 2d 1345, 1353-54 (2008) (comparing *Consolidated Bearings Co. v. United States*, 412 F.3d 1266, 1269 (Fed. Cir. 2005) with *In re Gartside*, 203 F.3d at 1312-13); *see also* 3 Charles H. Koch, Jr., *Administrative Law and Practice* §§ 10.1[1], 10.3, 10.4, 10.6 (2d ed. 1997 & Supp. 2006).

As above indicated, Customs' revocation rulings are conducted through formal notice and comment procedure. They therefore would appear to be not simply "interpretations contained in policy statements, agency manuals, and enforcement guidelines"[4] beyond the "pale" of the

---

[4] *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001), quoting *Christensen v. Harris County*, 529 U.S. 576, 587 (2000).

*Chevron* deference generally accorded to agency interpretations of statutes the agency is charged with administering. *Cf. Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984) *with Cathedral Candle Co. v. U.S. Intern. Trade Comm'n*, 400 F.3d 1352, 1361 (Fed. Cir. 2005) ("[n]ormally, courts accord *Chevron* deference when Congress has authorized the administrative agency 'to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed'"), quoting *Mead*, 533 U.S. at 229; *see also* 5 U.S.C. §§ 551(4)&(5) (defining "rulemaking" as the "agency process for formulating, amending, or repealing a rule," and a rule is defined as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy").

However, the court remains mindful of *Heartland By-Products, Inc. v. United States*, 264 F.3d 1126 (Fed. Cir. 2001), which essentially declared that revocation rulings are in the same class of Customs' "rulings" that are to be afforded the so-called "deference" of *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). 264 F.3d at 1135. *See Mead*, 533 U.S. at 228, 235; *see, e.g.*, *Warner-Lambert Co. v. United States*, 425 F.3d 1381, 1384 (2005); *Rocknel Fastener, Inc. v. United States*, 267 F.3d 1354, 1357 (2001). *Skidmore* requires "respect" for the thoroughness evident in the administrative ruling, for the validity of the reasoning that led to the ruling, for the evident consistency of the ruling with earlier and later pronouncements, for the formality with which the particular ruling was established, and for other factors that supply a "power to persuade, if lacking the power to control." *Skidmore*, 323 U.S. at 140; *see Mead*, 533 U.S. at 235; *see, e.g.*, *Warner-Lambert Co. v. United States*, 407 F.3d 1207, 1209 (Fed. Cir. 2005). In other words, *Skidmore* provides a neat restatement of the obvious, *i.e.*, the proper consideration that is, or should be, attempted as a matter of course on judicial review of *any* administrative proceeding.

## II. *Summary of Revocation Ruling*

As described in the previous opinion, the Yarn Ruling and the Revocation Ruling address the classification of the plaintiff's BKMY yarn product. BKMY is produced from polyester chips melted into a slurry to which aluminum or zinc powder and titanium dioxide (a delusterant) is added. The slurry is then "fired' through a spinneret to create the yarn.

The Yarn Ruling that was revoked allowed BKMY classifiable as a "metalized yarn" of subheading 5605.00.90, HTSUS (2011):

> Metalized yarn, whether or not gimped, being textile yarn, or strip or the like of heading 5404 or 5405, combined with metal in the form of thread, strip or powder or covered with metal:
> Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13.2%

The referenced headings, 5404 and 5405, HTSUS, cover "synthetic" and "artificial" (respectively) "monofilament of 67 decitex or more and of which no cross-sectional dimension exceeds 1 mm; strip and the like (for example, artificial straw) of synthetic textile materials of an apparent width not exceeding 5 mm". Decitex refers to the articles' linear mass density, or fineness.

The Revocation Ruling concluded that the Yarn Ruling was issued erroneously and that BKMY is classifiable under a lower duty rate in subheading 5402.47.90, HTSUS (2011):

> Synthetic filament yarn (other than sewing thread), not put up for retail sale, including synthetic monofilament of less than 67 decitex:
> Other, of polysters:
> Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8%

Customs began its analysis in the revocation proceeding by setting forth the standard legal construct for customs classification, to wit: Merchandise is classifiable under the HTSUS in accordance with the General Rules of Interpretation ("GRIs"). GRI 1 provides that classification shall be determined according to the terms of the headings and any relative section or chapter notes

and, provided such headings or notes do not otherwise require, according to the remaining GRIs 2 through 6. GRI 6, HTSUS, requires that the GRI's be applied at the subheading level on the understanding that only subheadings at the same level are comparable. The GRIs apply in the same manner when comparing subheadings within a heading. RR at 2.

After summarizing the relevant HTSUS provisions at issue, Customs quoted the relevant Harmonized Commodity Description and Coding System Explanatory Notes ("EN") to heading 5605, HTSUS. Customs noted that the ENs are neither legally binding nor dispositive, but constitute "official interpretation of the Harmonized System at the international level" as "commentary on the scope of each heading of the HTSUS and . . . are generally indicative of the proper interpretation of these headings." *Id.* at 3 (citation omitted). The EN to heading 5605, HTSUS, is as follows:

> This heading covers:
>
> (1) **Yarn consisting of any textile material (including monofilament, strip and the like and paper yarn) combined with metal thread or strip**, whether obtained by a process of twisting, cabling or by gimping, whatever the proportion of the metal present. The gimped yarns are obtained by wrapping metal thread or strip spirally round the textile core which does not twist with the metal. Precious metals or plated metals are frequently used.
>
> (2) **Yarn of any textile material (including monofilament, strip and the like, and paper yarn) covered with metal by any other process**. This category includes yarn covered with metal by electro-deposition, or by giving it a coating of adhesive (e.g., gelatin) and then sprinkling it with metal powder (e.g., aluminium or bronze).
>
> The heading also covers products consisting of a core of metal foil (generally of aluminium), or of a core of plastic film coated with metal dust, sandwiched by means of an adhesive between two layers of plastic film.
>
> The heading covers multiple (folded) or cabled yarn containing plies of the yarn referred to above (e.g., fancy cords as used by confectioners, obtained by twisting together two or more metallised yarns as described above). It further includes certain

other forms of yarn made in the same way and used for similar purposes, consisting of two or more parallel metallised yarns held together with a binding of metal thread or strip, and yarn or bundles of yarn gimped with yarn of this heading.

Metallised yarn may be gimped. It is used in the manufacture of trimmings and lace and of certain fabrics, as fancy cords, etc.

The heading **does not include**:
(a) Yarn composed of a mixture of textile materials and metal fibres conferring on them an antistatic effect (**Chapters 50 to 55**, as the case may be).
(b) Yarn reinforced with metal thread (**heading 56.07**).
(c) Cords, galloons or other articles having the character of ornamental trimmings (**heading 58.08**).
(d) Wire or strip of gold, silver, copper, aluminium or other metals (**Sections XIV and XV**).

*Id*. at 3-4 (as quoted in RR).

Based on the foregoing, when considering the plaintiff's argument that BKMY satisfies the terms of heading 5605 notwithstanding the "extremely minute amount of metal" and lack of description of the plaintiff's process of manufacture in the ENs, Customs agreed "that it is the nature of the product rather than the process of manufacture which is the key consideration in determining whether the product is classifiable in heading 5605." *Id*. at 4. After restating the definition of "metalized yarn" in heading 5605 ("being textile yarn, or strip or the like of heading 5404 or 5405, combined with metal in the form of thread, strip or powder or covered with metal"), Customs concluded that BKMY did not meet that definition as it was not "combined" with metal. Customs also considered "[w]hether a polyester slurry falls within the meaning of 'or the like'" and concluded that "is unclear from the legal text alone." Customs then looked to the ENs for heading 5605 for "guidance". Customs found that those ENs

clearly contemplate that not every product combining yarn and metal in some fashion will be considered a metalized yarn for tariff purposes. The ENs specifically describe two types of products covered by heading 5605, HTSUS: 1) Yarn consisting of any

> textile material (including monofilament, strip and the like and paper yarn) combined with metal thread or strip, and 2) Yarn of any textile material (including monofilament, strip and the like, and paper yarn) covered with metal by any other process. The ENs further emphasize that metalized yarn of heading 5605 is used for decorative purposes, for example "in the manufacture of trimmings and lace and of certain fabrics, as fancy cords, *etc.*". The ENs specifically exclude yarns composed of a mixture of textile materials and metal fibres [*sic*], and yarns reinforced with metal thread from classification in heading 5605, HTSUS. Thus, while heading 5605 may allow for new methods of production of metalized yarn, the mere presence of metal in the yarn does not automatically result in classification in heading 5605, HTSUS.

*Id*.

Customs concluded the description of "metalized yarn" in the ENs to heading 5605 was "also consistent with the common and commercial meaning of the term." *Id*. at 5. Examining dictionaries and other lexicographic materials to determine the common meaning of the term as well as consulting with industry sources, Customs confirmed that the extent of the commercial meaning of "metalized yarn" does not encompass every possible form of yarn with metal added but has a specific meaning consistent with the ENs to heading 5605 "which does not encompass the Best Key yarns at issue." *Id*. Commerce found that the common and commercial meanings of the term "indicate that 'metalized yarn' is commonly understood to mean either a pre-existing yarn consisting of any textile material combined with metal, or a plastic film deposited with metal and slit into yarn, generally used for decorative purposes." *Id*. Customs noted that the Federal Trade Commission definition of "metallic" is consistent with its conclusion, *see* 16 C.F.R. §303.7(o) ("A manufactured fiber composed of metal, plastic-coated metal, metal coated plastic, or a core completely covered by metal") and it found no "similar products" described as metalized yarns among the "numerous technical sources on metallic yarns and fibers" it consulted. *Id*. at 5-6. Rather, these "technical

sources on metalized yarn noted that metallic yarns consist of pre-existing yarn or plastic film bonded to metal", and they also "stress that they are used primarily for decorative purposes." *Id*.

"Similarly," Customs reasoned,

textile industry experts consulted by CBP from the American Fiber Manufacturers Association [AFMA] and the National Council of Textile Organizations [NCTO] were in agreement that the textile industry considers a metalized yarn to be either a textile yarn covered or coated with metal, or a plastic film deposited with metal and slit into yarn. This is consistent with what CBP has classified in heading 5605 in the past, and consistent with the Explanatory Notes to heading 5605, HTSUS. Thus, we conclude that the term "metalized yarn" as commonly and commercially understood, is a manufactured fiber composed of metal, plastic-coated metal, metal-coated plastic, or a core completely covered by metal, including metal sandwiched between layers of plastic, as in Lurex yarns, having a visible metallic effect or appearance.

*Id*. at 6.

Customs then responded to the plaintiff's comments submitted in opposition to the proposed revocation. Addressing the affidavit opinion of Ingrid Johnson, the plaintiff's authority on textiles who had opined that BKMY is a "metalized yarn" according to a then-forthcoming definition of metallic yarn in the latest edition of a *Fairchild* dictionary,[5] Customs noted that the *Fairchild* definition "is completely consistent with" the definitions of the technical sources Customs had summarized and "does not reference any method of production similar to that used by Best Key". *Id*. at 7. Customs further noted that "[a]lthough this definition allows for the possibility of other combinations of textile and metal, not specifically mentioned, being a metallic yarn, it does not state that any textile yarn containing metal must automatically be considered a metallic yarn" as argued by the plaintiff. Customs thus reasoned that regardless of whether the *Fairchild* definition

---

[5] *See* Phyllis G. Tortora and Ingrid Johnson, *The Fairchild Books Dictionary of Textiles*, p. 383 (Bloomsbury, 8th ed., 2013). The Revocation Ruling refers to this as "Fairchild's Dictionary of Fashion."

is intended to include such products or not, the definition does not support the argument that BKMY

should be considered metalized yarns for customs duty purposes, as

> [s]uch an interpretation would be far more expansive than the plain text of the
> heading, the ENs[,] or the technical definitions would support. Indeed, it is difficult
> to imagine what woudn't fall within the scope of metalized yarn based on such a
> reading.

*Id*. (noting antistatic yarns, and yarns reinforced with metal thread, as examples of articles coming

within the *Fairchild* definition but which are specifically excluded from heading 5605 pursuant to

its ENs). Customs did not find the "Angelina" fibers analogous because they "have a distinctive and

notable metallic, luminescent sheen." *Id*.

Customs then considered the more expansive claim, beyond visibility, to wit, that "in

a metalized yarn, the metal is added for a specific purpose, to add desirable characteristics to a fabric

such as . . . antimicrobial properties, or UV protection" as claimed by the plaintiff. *Id*. at 7-8.

Customs rejected the argument in this instance for four reasons. First, Customs found that the

plaintiff had provided no evidence to prove that the BKMY, for which the original Yarn Ruling letter

had been sought, in fact held the "desired characteristics" claimed of its metals, namely "that the

aluminum or zinc added to the instant yarns impart any microbial properties of UV protection to the

fiber, or even that they could have such an effect in such low concentrations." *Id*. at 8. Second,

Customs found that adding metal before extrusion "is not itself a new procedure" and that

"[h]eretofore, such products have not been considered metalized yarns." *Id*. (references omitted).

Third, Customs found that the various Customs rulings the plaintiff claimed as classifying yarns

having no metallic appearance in heading 5605 in fact are all described as "decorative" or "metallic"

or are used in decorative applications such as decorating packages. *Id*. Fourth, Customs noted that

while it "does not impose a strict requirement with respect to the amount of metal that must be present in order for a yarn to be considered metalized, tests conducted by the [Customs] Laboratory indicate that the samples of Best Key's yarns submitted for analysis contain only trace amounts of metal." *Id*. at 9. In sum,

> [g]iven that many products and preparations used in textiles, such as those of heading 3809[ ], contain metallic substances, and even natural fibers may naturally contain trace amounts of metal absorbed from the soil, many yarns may consequently have traces of metal simply as a result of common treatments such as dye fixing or delustring. To classify any fiber with as little metal as is present in the instant yarn in heading 5605 would expand the heading far beyond its current scope, to include any yarns which contain trace amounts of metal as a byproduct of common textile treatments and which have never been considered metalized yarn. As noted above, by contrast, the products recognized as metalized yarns in the textile industry have much higher concentrations of metal, with the result that the metal is immediately apparent.

*Id*. (footnote omitted).

### III. *Discussion*

As indicated above, heading 5605 addresses the imported state of textile yarn, or strip or the like of heading 5404 or 5405, combined with metal. The obvious question Customs had to address was whether the product contemplated for importation is a textile-yarn-metal combination in the sense contemplated by heading 5605.

Both parties acknowledge the axiom that it is a product's "nature" upon importation that controls its classification. They also agree it is not the process of manufacture that is "key" in determining whether a yarn is properly entered as "metalized yarn." Where they differ is not only over Customs' legal interpretation of the language of heading 5605 but also Customs' factual findings and conclusions in the Revocation Ruling. On review of an administrative record, of

course, the court is precluded from substituting judgment on facts with "two fairly conflicting views" in the absence of showing that a finding is arbitrary, capricious or an abuse of discretion, *Universal Camera Corp. v. NRLB*, 340 U.S. 474, 488 (1951), but the plaintiff argues that the language of heading 5605 is "clear," and that since the heading is *eo nomine*, it covers "all forms" of the article including BKMY. *See Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999).

The government is correct, however, that an *eo nomine* provision does not cover all forms when such coverage is contrary to legislative intent or when the articles are limited by the terms of the statute. In such a case, the provision only includes those articles embraced by the provision's language. Def's Resp. at 20, referencing *United States v. Charles R. Allen, Inc.*, 37 CCPA 110, C.A.D. 428 (1950); *RMS Electronics, Inc. v. United States*, 83 Cust. Ct. 37, 43, 480 F. Supp. 302, 306 (1979). Further, although the "clarity" of heading 5605 literally covers all forms of yarn-and-metal combinations, Customs implicitly found that the language cannot be interpreted literally, because it was not, in fact, intended to cover all forms, as evident in heading 5605's ENs' specific exclusion of four classes of articles from coverage (*e.g.*, antistatic yarns). *See* RR at 4. Customs' research and consultation with industry sources also confirmed that the commercial meaning of "metalized yarn" does not encompass every possible form of yarn with metal added. *Id*. at 5. Customs' conclusion that heading 5605 does not in fact cover "all forms" of yarn-and-metal combinations is persuasive, and the plaintiff's arguments to the contrary are not.

The plaintiff also disagrees with the Revocation Ruling's holding (assuming that is what it amounts to) that heading 5605 requires the combination of two distinct intermediary products, namely (i) a pre-existing yarn or strip "or the like" of heading 5404 or 5405, and (ii) metal

in the form specified in heading 5605.  However, the plaintiff does not persuade that Customs' interpretation is unlawful or should be regarded as unpersuasive.  As employed in heading 5605, "being textile yarn" *etc.* "combined with metal" obviously alludes to the state (*i.e.*, as imported) of "being" a metalized yarn intended to be encompassed by heading 5605 (*i.e.*, of unity or coalescence), but it may also encompass the process by which such a yarn is brought into "being" (*i.e.*, the result of which two or more substances are joined to make a single substance).  Since either interpretation is possible, the statute is ambiguous to that extent.  *See*, *e.g.*, *Rifkin Textiles Corp. v. United States*, 62 Cust. Ct. 316, 297 F. Supp. 1127, 1134 (1969) (the court "find[s] the term 'ornamented fabrics' to be ambiguous, taking that word in the sense that the court is not entirely certain of the meaning of the statutory language when applied to the particular facts of this case" and therefore "resort to pertinent authoritative materials to ascertain the meaning of the term is permissible").  The plaintiff opted for this route of administrative and judicial process, and it is not the court's function in this proceeding to resolve that ambiguity but only determine whether Customs' ruling has "power to persuade" in accordance with *Mead* and *Skidmore*.  Customs emphasized on the record that it is the nature of the product upon importation that is determinative, *see* RR at 4, and contrary to the plaintiff's contention, the court is not persuaded that the process of "being . . . combined" is "irrelevant" to that determination and an erroneous interpretation of the statute.

The plaintiff further argues Customs "seeks to engraft" the exemplars of the ENs to heading 5605 "as limitations on the construction of heading 5605 itself", which type of "reasoning was explicitly rejected by the Federal Circuit in *Midwest of Cannon Falls, Inc. v. United States*, 122 F.3d 1423 (Fed. Cir. 1997)".  Pl's Br. at 22.  This appears to misinterpret Customs' analysis, *supra*,

and the *Cannon Falls* decision.  Customs did not "engraft" from the ENs to heading 5605 but looked

to them for guidance.  The process of that interpretive guidance is in contrast with the *Cannon Falls*

case, which involved Customs' reading into the HTSUS provision for "Christmas ornaments" the

limitation "tree."  The term was clearly not present in the relevant tariff provision.  The "tipping

point" for the Federal Circuit on the issue, however, was not Customs' interpretation of the ENs

therefor, but the apparent fact that "tree" had been explicitly excluded by Congress upon supersedure

of the prior tariff provision of the Tariff Schedules of the United States, in which the term "tree" had

appeared.  *See* 122 F.3d at 1429 ("The examples in the Explanatory Notes, however, cannot control

here, *particularly in light of* the congressional omission of the word 'tree.'") (italics added).

Continuing, the plaintiff makes the parallel argument that a tariff provision will

encompass a future-developed version of a product if the product bears an "essential resemblance"

to the goods (or, where applicable, exemplars) identified in the tariff heading.  Pl's Br. at 27-28,

referencing *Brookside Veneers, Ltd. v. United States*, 847 F.2d 786, 789 (Fed. Cir. 1988).  The

government's position is that "because the language of heading 5605, HTSUS, makes clear that

Congress intended that the statute be limited to only those products embraced by its language", the

"essential resemblance" doctrine is inapplicable to the instant goods.  Def.'s Resp. 26-27.  The

plaintiff contends the government is implying, in effect, that heading 5605 is an evolutionary "dead

end" that cannot be stretched to embrace newly-developed products.

Here, the plaintiff overstates the government's position.  Nowhere does Customs

contend that a "newly developed product" would not be a product of heading 5605 "embraced by

its language".  The plaintiff asks why would the combination of metal powder with plastic in liquid

polymer form (*i.e.*, the plaintiff's process) "be something prohibited or unanticipated under the statute?", Pl's Reply at 17, but it is the "nature" of the product, not the newness of its "development" (or technical production process), that drives its classification. Customs simply found the plaintiff's product classifiable under a different heading (5402.47.90, HTSUS), and the plaintiff's rhetoric does not render Customs' Revocation Ruling unreasonable or unpersuasive.

The plaintiff next accuses Customs of "substantial *ex parte* communications between Customs and domestic industry lobbyist groups and competitors of Best Key for the purpose of soliciting their comments" which "is 'intolerable' and alone renders the proceedings arbitrary." Pl's Reply at 20, referencing *Home Box Office, Inc v. FCC*, 567 F.2d 9, 54 (D.C. Cir. 1977). *See also id*. at 24. However, there is no indication from the record that the individuals involved in the communications were with "competitors" of the plaintiff or "lobbyists" on the issue, let alone that this is an instance where domestic industry representatives "described the kind of . . . regulation that, in their view, [they] 'could live with.'" 567 F.2d at 53. Nor does the plaintiff persuade that there is a "possibility that there is here one administrative record for the public and this court and another for [Customs] and those 'in the know'". *Id*. at 54. *Cf.* Slip Op. 13-145, 37 CIT ___ (Dec. 4, 2013). It is plain from the record that during Customs' internal debate, prior to deciding whether the Yarn Ruling should be revoked or was correct, it simply reached out for help informing its own expertise. *See, e.g.,* Administrative Record Document ("AR") at 539-42. That is not unlawful.

Nonetheless, the plaintiff also takes issue with what it claims is the government's "conclusory" characterization of the plaintiff's "expert-opinion" affidavit on the record (which source avers that BKMY "bears an essential resemblance to metalized yarns known to commerce

and science") by attempting to disparage the level of expertise and opinions of the head of AFMA and the vice-president of NCTO. For example, the plaintiff claims the record "certainly" establishes that the opinion of the plaintiff's supporter "is much more reliable than the supposed 'industry experts' consulted by Customs." However, Customs appears to have adequately considered the opinion of the plaintiff's expert in its ruling construing the relevant statute. Customs' construction is not unlawful, and the court must defer to the agency's reasonable factual conclusion on whether the BKMY does or does not meet the statutory definition of "metalized yarn" as lawfully construed.

The plaintiff further contests the Revocation Ruling's statement that AFMA and NCTO "were in agreement that the textile industry considers a metalized yarn to be either a textile yarn covered or coated with metal, or a plastic film deposited with metal and slit into yarn" as a misrepresentation of the substance of Customs' communications with NCTO, and assignment to that group and others positions not reflected in the administrative record. If the plaintiff is correct on this latter point, it has not been prejudiced by Customs' arguably erroneous characterization. *See* 5 U.S.C. §706 (requiring "due account . . . of the rule of prejudicial error"). Whether it is an arguable "stretch" to characterize NCTO's communications with Customs, on behalf of itself and also in expressing the "view" of the head of AFMA, as those organizations' "agreement" with Customs' interpretation of heading 5605, those communications do, however, express the organizations' representatives' understanding of the question, and there is no indication on the record that those representatives or organizations held or would have held views significantly different than as stated by Customs. The court's role in this record does not involve re-weighing the evidence, choosing

between fairly competing alternatives, and substituting its own factual findings or judgment therefor. *Universal Camera Corp.*, *supra*.

The plaintiff also argues that the Revocation Ruling evinces a "lack of thoroughness" because Customs never "followed up" on information received from industry officials indicating that BKMY was in fact not a product unknown to the "metalized yarn industry." Pl's Reply at 22. Even if Customs was required to follow up on that line of thought, it is unclear what additional information, if any, would have necessitated a different or contrary analysis or interpretation of heading 5605. In any case, it is evident that Customs considered the addition of "chemicals [like metal] before extrusion", *see*, *e.g.*, AR at 541, in making its Revocation Ruling, as outlined above.[6]

On a different tack, the plaintiff contends the Revocation Ruling arbitrarily applies an "unstated and ambiguous" *de minimis* standard of metal content "for the purpose of" revoking the Yarn Ruling. Pl's Br. at 40-43, referencing *Del Monte Corp. v. United States*, 730 F.3d 1352 (Fed. Cir. 2013); Pl.'s Reply at 25-29. *Del Monte* involved "a *century* of tariff enforcement to the effect that 'in oil' signifies any amount of such substance" for purposes of classifying *fish* packed "in oil." 36 CIT ___, 885 F. Supp. 2d 1315, 1320 (2012) (italics added). That is not this case. Further, the plaintiff's argument relies on the false premise that Customs set a *de minimis* standard for heading 5605, which the record does not support, and which the plaintiff itself recognizes. *See* Pl's Br. at

---

[6] The court merely notes in passing that the plaintiff ascribes nefarious and "disturbing" motives to Customs' internal discussion of "policy concerns" to argue that the Revocation Ruling is results-oriented. The argument fails. Nothing on the record indicates that Customs' discussions were results-oriented, and Customs' "policy" is precisely what 19 U.S.C. §1625 rulings are all about, at least in part. Customs' free and unfettered discussion thereof, internal or otherwise, albeit with notice and comment as circumstances may require, at any time is to be encouraged. *See*, *e.g.*, *International Custom Products, Inc. v. United States*, 32 CIT 302, 307, 549 F. Supp. 2d 1384, 1391 (2008).

40 (the Revocation Ruling "does not impose a strict requirement with respect to the amount of metal that must be present in order for a yarn to be considered metalized"), citing AR at 9. The absolute amount of a substance's presence does not determine the applicability of the *de minimis* rule, the intent of its introduction to serve a definite and useful purpose does, in which case the rule is inapplicable. *See*, *e.g.*, *Canada Dry Ginger Ale, Inc. v. United States*, 43 Cust. Ct. 1, 8-9 (1959). In any event, Customs did not conclude during the revocation proceeding that the subject yarn was not a metalized yarn "due" to an insufficient amount of metal, Customs determined that the yarn did not qualify as a metalized yarn because it did not fall as a matter of fact within the scope of the statutory language of heading 5605 and within the meaning of the term "metalized yarn."

Continuing on this point, the plaintiff argues that the tariff definition of "metalized yarns" covers articles with any proportion of metal present, and it points to the ENs to heading 5605 for "support" because the ENs contain no language which requires a minimum threshold amount of metal in the yarn. All the same, it cannot be concluded that the Revocation Ruling was arbitrary or capricious in concluding that the mere presence of metal in yarn does not automatically result in classification in heading 5605.

In its motion for judgment, Pl's Br. at 41, the plaintiff cites to the Informed Compliance Publications (ICPs) "Classification: Apparel Terminology under the HTSUS" (June 2008) ("*ICP I*") and "Classification of Fibers and Yarns" (Sep. 2011) ("*ICP II*"), to support its contention that any presence of metals in textile yarn would qualify the product as a metalized yarn of heading 5605. These ICPs do not appear to be part of the administrative record before the court but are included (albeit improperly, the government contends) in full in the plaintiff's Appendix of

Documents. The plaintiff cited to the February 2009 version of the latter in its request for reconsideration (*see* AR 394 n.2), and it here argues that *ICP II* states that while the actual amount of metal present is typically quite small, "any of *these* yarns that have metal present, whatever the portion of metal present, is classified as a metalized yarn under heading 5605." *See ICP II* at 17 (italics added). But as the government points out, when examined in context this single phrase recited in the plaintiff's submission to Customs clearly speaks to "those" yarns that are included in subsection (1) of the ENs to heading 5605, *i.e.*, yarns combined with metal thread or strip, and/or refers to Note 2(B)(a) of Section XI, HTSUS.[7] The ICPs do not discuss the issue addressed in the Revocation Ruling, which is whether a product made by adding nanometals to polyester slurry results in a metalized yarn in the first instance.

Nonetheless, the plaintiff argues that prior rulings have "uniformly" and "correctly" stated that a yarn that contains any amount of metal is considered in its entirety as a metalized yarn for tariff purposes, and that Customs only considers whether the yarn contains any metal. Pl's Br.

---

[7] The plaintiff also claims to take issue (Pl's Reply at 17-18), but in reality agrees, with the defendant's interpretation of Note 2 of Section XI, HTSUS :

> (A) Goods classifiable in chapters 50 to 55 or in heading 5809 or 5902 and of a mixture of two or more textile materials are to be classified as if consisting wholly of that one textile material which predominates by weight over each other single textile material. . . .
> (B) For the purposes of the above rule:
> (a) metalized yarn (heading 5605) [is] to be treated as a single textile material the weight of which is to be taken as the aggregate of the weights of its components; for the classification of woven fabrics, metal thread is to be regarded as a textile material.

In particular, the plaintiff proposes that a yarn composed of 90% polyester and 10% metal would be classified as a polyester yarn if the "10% metal" component is actually a "non-metalized" yarn, and note 2(A) applies, whereas note 2(B) applies if the product as a whole is a metalized yarn. But that still begs the question of whether BKMY is or is not classifiable as a "metalized yarn."

at 41. The plaintiff complains that Customs has arbitrarily "separated" its yarn from all other "metalized yarn" products in holding that its yarn alone is not metalized yarn. Contrary to such hyperbole, however, Customs did not act arbitrarily and capriciously in holding that the yarn was not "metalized" or in treating it differently from the products included in rulings cited by the plaintiff. As discussed in the Revocation Ruling, the rulings the plaintiff referenced are distinguishable from the plaintiff's yarn because they are rulings in which yarns were described as "decorative" or "metallic" or were used in decorative applications. *See* RR at 8, citing NY N062518, NY L82752, NY R00713, NY J84177, NY J82793 (revoked by HQ 967829), NY I80137, NY J84274, NY B89028, NY B89130, NY B89128, NY N062518 and NY R00713. None of the "decorative" or "metallic" yarn rulings involve a product created with the plaintiff's metal-in-the-slurry technique, which the plaintiff describes as a "new and unique nanometal process." The cited rulings are for statutory metalized yarns, primarily yarns plied with metallic strip. *See*, *e.g.*, NY J82790 ("decorative metallized yarn" comprised of polypropylene yarn mixed with metallic strip); NY L86561 (polyester yarn "in the form of metallic strips"); NY F83891 (aluminum-coated polyester strip); NY N034758 (metalized yarn comprised of acrylic and polyester coated with metal). These products clearly have metallic or metalized fibers or strip in them and were not produced through the addition of nanometals to a slurry. BKMY was not classified in the same manner as these products because it is not of the same nature.

Furthermore, it is incorrect to state that Customs has never considered any yarn containing metal to be anything other than "metalized" for tariff purposes. In HQ 952934 (July 19, 1993), Customs' Headquarters ruled on the classification of a fabric comprised of 45% cotton, 47%

polyester and 8% stainless steel. *See* AR at 511-516. The yarns from which the fabric was constructed were characterized by a core of polyester fibers mixed with micro fiber stainless steel surrounded by cotton fiber. The fabric was used to manufacture garments that provide protection from microwave radiation. Customs sought to determine whether the metal fiber incorporated in the fabric could be characterized as "metalized yarns" or "metal thread." Citing the ENs to heading 5605, HTSUS, Customs concluded that "[i]t is our position that the stainless steel fibers that are combined with the textile fibers to compose this fabric are not considered 'metalized yarns' classifiable in heading 5605." Customs found that the fabric did not consist of yarns combined with metal thread or strip, nor was it a yarn covered with metal by any process. Unlike the rulings cited by the plaintiff, which concern products that are decorative and/or that involve textile items comprised in part of metal fiber, this ruling may be more directly on point. Although the stainless steel was present in substantial quantities, the yarn was not "metalized" because it did not fit within the products described in the ENs, which is similar to Customs' holding in the Revocation Ruling.

For the purpose of addressing the plaintiff's arguments in the revocation proceeding, Customs assumed, but did not concede, that yarns "metalized" for a specific, practical, non-decorative purpose are within the scope of heading 5605. Customs then bolstered its ultimate conclusion that the Yarn Ruling should be revoked by noting that its laboratory analysis had found only a "trace" of metals in the plaintiff's yarn at a level apparently consistent with naturally occurring content or leftover intermediate processes (*e.g.* dye fixing or delustring).[8] Customs observed that "the actual amount of metal present is quite small in relation to the weight of the textile fibers" and

---

[8]     The plaintiff argues that the metal introduced into the polyester slurry should not be considered "trace", but the plaintiff points to nothing in the record to the contrary.

it thus found that the record lacked evidence to support that the metals in the BKMY provided the specific, practical, non-decorative purposes claimed even assuming the hypothetical that heading 5605 encompasses non-decorative metal properties.

The plaintiff argues that analysis is legally irrelevant insofar there is no explicit "requirement" in heading 5605 that the metal of the metalized yarns thereof perform any specific function, and thus the plaintiff argues that it did not have to prove anything other than the fact that it intentionally added a quantum of metal to its polyester slurry in order to qualify the product as a metalized yarn of heading 5605. But again, the plaintiff's literal reading of heading 5605 cannot be the case. Even "whimsy" is motivated by desire -- all metal is sought (or introduced) for its specific, desired properties, *cf.*, *e.g.*, *Wacker Chemical Corp. v. United States*, 78 Cust. Ct. 113, 117 (1977); *E. Taranger, Inc. v. United States*, 51 Cust. Ct. 298, 300 (1963); *C.J. Tower & Sons v. United States*, 32 Cust. Ct. 339, 344 (1954); *C.J. Tower & Sons v. United States*, 26 Cust. Ct. 284, 290 (1951) -- and the plaintiff's claim to Customs, that it added nanometal particles in BKMY intentionally for specific properties (aluminum or zinc for ultraviolet protection, silver or copper for antimicrobial applications and the like),[9] belies the argument it would make here.

Customs' analysis of the hypothetical, of the claim that any amount of metal added to impart some desirable quality beyond visibility qualifies the product as a "metalized" yarn of heading 5605, clearly indicates that if the claimed quality is not obviously discernable, it must at least be measurable, which implies at least a minimum threshold or quantum of proof that the

---

[9] Notwithstanding its assertions here on what was before Customs, at least for purposes of the Yarn Ruling it appears the plaintiff claimed that the antimicrobial properties of its BKYM (at the time) are imparted by titanium dioxide added to the polyester slurry, not silver.

imparted, desired quality is in fact imparted. *Cf. United States v. American Shipping Co.*, 15 U.S. Cust. App. 249, T.D. 42261 (1927) (the term "however small" added nothing to the specificity of paragraph 1430 of the Tariff Act of 1922). In the end, Customs reasoned that to classify in accordance with the logic of the plaintiff's argument any fiber "with as little metal as is present in the instant yarn in heading 5605 would expand the heading far beyond its current scope, to include any yarns which contain trace amounts of metal as a byproduct of common textile treatments, and which have never been considered metalized yarn."

This logic holds especially persuasive power. By the plaintiff's literal reasoning, even a barely measurable amount of metal -- a couple of atoms? -- "intentionally" introduced and dispersed into a slurry would suffice for a "metalized" yarn of heading 5605. That is, quite literally, *reductio ad absurdum*.

The plaintiff points to no statutory language in heading 5605 or otherwise that would indicate Congress intended that heading to apply to any product containing any amount of metal, no matter how minute, and regardless of its effect or purpose, and unlike *Dal Tile*, this statue is not "plain" regarding the amount of metal necessary to make a "metalized" yarn. *Cf. Dal-Tile Corp. v. United States*, 424 F.3d 1286, 1290 (Fed. Cir. 2005), referencing *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 471 (1989) (Kennedy, J., concurring) (absurdity excepts "plain" meaning where it is "quite impossible" Congress intended the result). The court, thus, is not persuaded that "whatever the proportion of the metal present" (*see* ENs to heading 5605; *cf. ICP I & ICP II*), which is not a part of the language of heading 5605 itself, was written with an intent to

encompass the minute "proportion" to which nanoparticulate metal may theoretically be reduced and "intentionally" introduced into a product resulting from the likes of the plaintiff's process.

During the revocation proceeding, the plaintiff did not persuade Customs that heading 5605 actually encompasses any non-decorative properties of metal as well as decorative properties. No opinion here need be expressed on whether that is a correct reading of heading 5605, because in the final analysis the plaintiff failed to prove to Customs that even if heading 5605 does encompass non-decorative metal properties, the BKMY considered for purposes of the Yarn Ruling in fact exhibits the specific properties claimed to be provided by the "combined" metal. Custom's factual finding on this issue in the Revocation Ruling, and more broadly that the BKMY is not a metalized yarn of heading 5605, was therefore not arbitrary or capricious, and the court may not substitute judgment therefor.

The plaintiff has failed to persuade that the Revocation Ruling, as a whole, is arbitrary, capricious, an abuse of discretion, or not in accordance with law, and the court finds that the Revocation Ruling has the power to persuade, and also that the plaintiff's remaining arguments are without merit.

*Conclusion*

In view of the foregoing, the plaintiff's motion for judgment is denied.  The defendant's USCIT Rule 12(b)(1) motion to dismiss is converted into a cross-motion for judgment pursuant to USCIT Rule 56.1.  *See*, *e.g.*, *Carl v. U.S. Secretary of Agriculture*, 36 CIT ___, 839 F. Supp. 2d 1351 (2012).  Upon consideration in accordance with the foregoing, that motion is granted, and the defendant's alternative motion for further discovery, and the plaintiff's motion for oral argument, are hereby dismissed as moot.

**So ordered**.


 /s/  R. Kenton Musgrave
R.  Kenton Musgrave, Senior Judge


Dated: February 25, 2014
        New York, New York